## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| **LYNNETT MYERS, et. al,** | |
| **Plaintiffs,** | **Case No. 2:15-cv-2956** |
| **v.** | **Judge Algenon L. Marbley** |
| **MEMORIAL HEALTH SYSTEM MARIETTA MEMORIAL HOSPITAL,** | **Magistrate Judge Terrence P. Kemp** |
| **Defendants.** | |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs respectfully ask this Court to issue a preliminary injunction enjoining Defendants from engaging in further inappropriate communications with absent class members in this case, for corrective notice, that Defendants bear the cost of corrective notice, and for attorneys' fees associated with bringing this motion and associated with obtaining a complete and accurate class list. For the reasons stated herein, this Court should **GRANT** Plaintiffs' motion.

Respectfully Submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.    (0093584)
Lance Chapin            (0069473)
Chapin Legal Group, LLC
580 South High Street, Suite 330
Columbus, Ohio  43215
Telephone:    614.221.9100
Facsimile:    614.221.9272
E-mail:   sbabin@chapinlegal.com

Attorneys for Plaintiffs
Lynnett Myers, *et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **LYNNETT MYERS, et. al,** | |
| **Plaintiffs,** | **Case No. 2:15-cv-2956** |
| **v.** | **Judge Algenon L. Marbley** |
| **MEMORIAL HEALTH SYSTEM MARIETTA MEMORIAL HOSPITAL,** | **Magistrate Judge Terrence P. Kemp** |
| **Defendants.** | |

## PLAINTIFFS' BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION

Respectfully Submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.    (0093584)
Lance Chapin          (0069473)
Chapin Legal Group, LLC
580 South High Street, Suite 330
Columbus, Ohio  43215
Telephone:    614.221.9100
Facsimile:     614.221.9272
E-mail:   sbabin@chapinlegal.com

Attorneys for Plaintiffs
Lynnett Myers, *et al.*

## Contents

INTRODUCTION ...................................................................................................................... 5

STANDARD OF REVIEW ......................................................................................................... 5

ANALYSIS .................................................................................................................................. 6

I.    Likelihood of Success on the Merits .............................................................................. 6

    A.    Facts Related to Likelihood of Success on the Merits ........................................... 6

        1.    Affidavits of Plaintiffs ....................................................................................... 6

        2.    Arva Lowther Deposition .................................................................................. 7

        i.    Employees Never Took Lunch ......................................................................... 7

        ii.    Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch .......................................................................................................................... 8

        iii.    No Lunches Ever Scheduled ........................................................................... 9

        iv.    Inadequate Training on Lunch Policies .......................................................... 9

        v.    Management Altered Payroll ........................................................................... 10

        3.    Carol Butler Deposition .................................................................................. 11

        i.    Employees Never Took Lunch ....................................................................... 11

        ii.    Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch ........................................................................................................................ 11

        iii.    Inadequate Training ...................................................................................... 12

        4.    Stacy Hanlon .................................................................................................. 12

        5.    Lynnett Myers' Deposition ............................................................................ 13

        i.    Employees Never Took Lunch ....................................................................... 13

        ii.    Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch ........................................................................................................................ 13

        iii.    No Lunches Ever Scheduled ......................................................................... 13

        iv.    Management Altered Payroll ......................................................................... 14

        v.    Worked Overtime ........................................................................................... 14

        6.    Kim Weckbacher's Deposition ....................................................................... 14

        i.    Employees Never Took Lunch ....................................................................... 14

        ii.    Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch ........................................................................................................................ 15

        iii.    No Lunches Ever Scheduled ......................................................................... 16

        iv.    Inadequate Training on Lunch Policies ........................................................ 16

        v.    Management Altered Payroll ......................................................................... 16

        vi.    Overtime ....................................................................................................... 16

        7.    Josh Booth's Deposition ................................................................................ 17

        i.    Employees Never Took Lunch ....................................................................... 17

        ii.    Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch ........................................................................................................................ 17

        iii.    No Lunches Ever Scheduled ......................................................................... 17

iv.    Inadequate Training ...................................................................................................17

8.    Mary Clegg's Deposition .........................................................................................18

i.    Employees Never Took Lunch..................................................................................18

ii.    Inadequate Training .................................................................................................18

iii.    Worked Overtime......................................................................................................18

B.    Class Members Have A Likelihood of Success on the Merits Of Each Claim ...............................19

1.    FLSA ........................................................................................................................19

i.    Legal Framework .....................................................................................................19

ii.    Defendants' Pay Policy Illegally Places the Onus on the Employee to Maintain records.........................19

iii.    Defendants Failed to Pay Class Members for All Hours Worked in Violation of the FLSA....................21

2.    Ohio Minimum Fair Wage Standards Act ...............................................................24

3.    Ohio Revised Code § 4113.15 .................................................................................24

4.    Unjust Enrichment ...................................................................................................25

5.    Success on the Merits for Entire Class .....................................................................25

II.    Irreparable Harm .................................................................................................................27

A.    Facts Related to Irreparable Harm ..................................................................................27

B.    Class Members Have Suffered Irreparable Harm and Will Continue To Suffer Irreparable Harm Unless the Court Intervenes ...............................................................................................29

**III.    Substantial Harm to Others** ....................................................................................33

**IV.    The Public Interest Will Be Served By Issuing the Injunction** ...............................33

CONCLUSION ..............................................................................................................................34

Certificate of Service .....................................................................................................................36

## EXHIBIT LIST

**Ex. A………………...Personnel Policy No. 40:01**
**Ex. B………………..Myers Affidavit**
**Ex. C………………..Butler Affidavit**
**Ex. D………………..Lowther Affidavit**
**Ex. E………………...Personnel Policy No. 80:05**
**Ex. F………………...Clegg Affidavit**
**Ex. G………………..Johnson Affidavit**
**Ex. H………………..Weckbacher Affidavit**
**Ex. I…………………Booth Affidavit**
**Ex. J…………………Docs. of Maralee Alkire, Gina Tucker, Mary Goode**
**Ex. K………………...Email Sent February 24, 2017 Requesting Verification That The List Is Complete and Accurate**

## INTRODUCTION

Class Members follow in the footsteps of many healthcare workers who have spoken up in recent years against hospitals across the country that illegally deny wages to their employees. This case implicates Defendants' automatic lunch deduction policy that failed to compensate Class Member employees for all hours actually worked. Defendants automatically deducted 30 minutes from each shift worked by Class Members, regardless of whether the employees actually took the meal break. Although the policy does provide for compensating unpaid lunches, in practice the policy is not followed. (EX. A Defendant's Personnel Policy No. 40:01)

During the pendency of this litigation, Defendants have engaged in unilateral communications that have intimidated class members. These actions have created an atmosphere of fear that has dissuaded and discouraged absent Class Members from participating in this litigation. For this reason, Plaintiffs have moved for a preliminary injunction and request that the Court (1) enjoin Defendants from further unilateral communications with absent Class Members, (2) issue corrective notice, (3) that Defendants bear the burden of corrective notice, and (4) for attorneys' fees.

## STANDARD OF REVIEW

A preliminary injunction is a remedy used by the court to preserve the status between the parties pending trial on the merits. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). When determining whether to grant a preliminary injunction, this Court must balance the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction."

*Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir.2002).

<u>ANALYSIS</u>

I.     <u>Likelihood of Success on the Merits</u>

    A.     **Facts Related to Likelihood of Success on the Merits**

        1.     **Affidavits of Plaintiffs**

Lynnett Myers, Carol Butler, and Arva Lowther have submitted affidavits attesting that patient care employees did not clock in and out for meal breaks and that the hospital had a policy of automatically deducting thirty minutes from each shift for a meal period regardless of whether the employees actually took a break. (Affidavit of Lynnett Myers, Ex. B at ¶ 6; Affidavit of Carol Butler, Ex. C at ¶ 6; Affidavit of Arva Lowther, Ex. D at ¶ 6.) All three women stated that they worked as nurses, each in multiple departments, for various time periods between 2004 and 2015. (Ex. B at ¶ 2; Ex. C at ¶ 2; Ex. D at ¶ 2.) They were paid hourly and often worked more than forty hours in a week. (Ex. B at ¶¶ 3, 5; Ex. C at ¶¶ 3, 5; Ex. D at ¶¶ 3, 5.)

Each of them stated: "I do not recall a single day in the last three years when I was able to take a full 30-minute meal break free from all my job duties." (Ex. B at ¶ 8; Ex. C at ¶ 8; Ex. D at ¶ 8.) They were never scheduled for a 30-minute uninterrupted meal break and their attempted breaks were regularly interrupted. (Ex. B at ¶ 9; Ex. C at ¶ 9; Ex. D at ¶ 9.) Finally, they stated that the automatic meal break deduction policy applies to "all employees responsible for direct patient care at Memorial Health System." (Ex. C at ¶ 7; Doc. 7-2 at ¶ 7; Ex. D at ¶ 7.)

They further averred that "[o]ther employees responsible for direct patient care are also interrupted or miss meal breaks, but are subject to the automatic deduction." (Ex. B at ¶ 7; Ex. C at ¶ 7; Ex. D at ¶ 7.) They also stated that they were reprimanded when they attempted to cancel the automatic lunch deductions due to a missed break, and that they were discouraged from

leaving the floor during any scheduled meal break. (Ex. A at ¶¶ 7-8; Ex. B at ¶¶ 7-8; Ex. C at ¶¶ 7-8.) Finally, they stated that "[m]anagers were aware that nurses were required to work or were interrupted during their meal breaks, and they did not ensure that . . . nurses were completely relieved of their work duties during their uncompensated 'meal periods.'" (Ex. B at ¶ 12; Doc. Ex. C at ¶ 12; Ex. D at ¶ 12.)

### 2. Arva Lowther Deposition

Defendants deposed Ms. Lowther on August 23, 2016. (Lowther Depo. Pg. 1.)

#### i. *Employees Never Took Lunch*

Ms. Lowther testified at deposition that she was too busy to take a lunch. (Lowther Depo. Pg. 154.) Ms. Lowther further testified that Defendants maintained a policy or practice of not allowing employees to take a lunch. (Lowther Depo. Pg. 154.) Ms. Lowther stated the following at deposition:

> A. Just that that's all what we believed because that's all we were assuming because of the way that it was mentioned, not to be clocking out and, you know --
>
> Q. Who discouraged you from leaving your floor during any part of your shift?
>
> A. Well, you weren't, you know, allowed to -- really to -- encouraged to leave the floor, so what would you think?· You weren't allowed to leave the floor. We were supposed to cover our patients, and there wasn't anybody else to cover you, so what were you supposed to do, just leave the floor and leave the patients uncovered?

(Lowther Depo. Pg. 154.)

Ms. Lowther testified to talking to staff members throughout the building about not taking a lunch. (Lowther Depo. Pg. 158.) Ms. Lowther provided 10 specific names of co-workers with whom she spoke regarding not getting paid and working through lunch. (Lowther Depo. Pg. 158.) Ms. Lowther explained that there were many other employees with whom she spoke

regarding not taking lunch or getting paid, however, she did not remember their names. (Lowther Depo. Pg. 158.)

Ms. Lowther explained how she knew her colleagues did not take lunch stating, "[w]hen you're working with somebody, you know what's going on. You're all on the same floor. If anybody leaves the floor, they have to tell you they're leaving." (Lowther Depo. Pg. 52.) Ms. Lowther further asserted that "[w]e all discussed the fact that we didn't get time for a lunch break." (Lowther Depo. Pg. 54.)

> ii.     ***Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch***

Ms. Lowther testified that Defendants had a standing policy of not letting employees take a lunch break or clock out no lunch. (Lowther Depo. Pg. 154; "Yeah, there was a standing practice. Everybody knew they had to cover the floor and that they really couldn't take breaks.") Ms. Lowther stated that "[s]everal of the employees I had talked to had been told not to clock out for lunch." (Lowther Depo. Pg. 44.) Ms. Lowther also stated that charge nurse, Amber Miller, stated "that it sounds like there could be ramifications if you did clock out for lunch." (Lowther Depo. Pg. 45.) Ms. Lowther further testified to the following:

Q. So did you understand what the policy was about clocking out for lunch?

A. After a while I did. I didn't at first.· And it was like, you know, you can clock out for lunch and then you'd have to clock back in. But nobody ever did that because we didn't have time to do that. You didn't have time to clock out for lunch.

Q. What is your understanding as to the policy about clocking in or out for lunch?

A. Well, the only thing that I understand was that I was told not to do that.

(Lowther Depo. Pg. 41.)

Ms. Lowther testified that understaffing was one reason employees could not take lunch, and that she reported these staffing issues up the chain of command to the vice president of nursing Bobbie Howard. (Lowther Depo. Pg. 94-6.) Ms. Lowther explained that Ms. Howard said there was not "anything they could do because of the budgets and stuff, that we couldn't allow any more staffing for the unit." (Lowther Depo. Pg. 96.)

Ms. Lowther also stated that she spoke with her manager, Mandy Riess, about not having time to take a lunch and not getting paid. (Lowther Depo. Pg. 160-1.) Ms. Lowther testified that her manager, Ms. Riess, told her not to clock out no lunch. (Lowther Depo. Pg. 44.) Ms. Lowther testified that Ms. Riess told her and other employees not to clock out no lunch. (Lowther Depo. Pg. 56.)

### iii.    No Lunches Ever Scheduled

Ms. Lowther testified that managers never scheduled lunch breaks. (Lowther Depo. Pg. 105.) Ms. Lowther further averred that clinical managers "never scheduled lunch breaks." (Lowther Depo. Pg. 105.) Ms. Lowther also explained that charge nurses had no responsibility for reporting or tracking the time of other employees even when no manager was working or present. (Lowther Depo. Pg. 105.)

### iv.    Inadequate Training on Lunch Policies

Ms. Lowther did not recall being specifically trained on the auto deduct lunch time system or how to clock out no lunch. (Lowther Depo. Pg. 64-5, 70-2.) Ms. Lowther noted that she probably received training on how to clock out no lunch on the timekeeping system when she first started working at the hospital. (Lowther Depo. Pg. 83.)

When discussing her training, Ms. Lowther testified to the following:

Q. And do you believe that you were familiar with the policies and procedures of the hospital?

9

A. Some of them.· Some of them were kind of long and complicated and, you know.

(Lowther Depo. Pg. 35-6.)

### v. *Management Altered Payroll*

Ms. Lowther testified that when she clocked out no lunch, the meal deduction was never actually canceled and she was not paid for the missed meal period. (Lowther Depo. Pg. 40.) Ms. Lowther testified that even when she used the clock out no lunch option, she "never got confirmation that [she] was paid," and Defendants never provided her proof of the hours she "had worked and that [she] clocked out no lunch." (Lowther Depo. Pg. 90.) Ms. Lowther testified to the following:

Q. So can you tell me the various complaints that you would have had or questions about your paycheck that you went to human resources about?

A. Well, there was a couple of times that I went to them about, you know, clocking out for lunch because we weren't getting paid for it. And there was times when we were like really busy and didn't get lunches, especially when I worked the telemetry floor. And there was times when we would clock no lunch, but I wasn't sure if I got paid for it or not.

And you kind of went down there and you kind of felt like you got a runaround. You didn't get any answers, so you'd just get aggravated and leave.

(Lowther Depo. Pg. 40.)

Q. Why did you go to HR about clocking out no lunch? What was your discussion with Charlotte?

A. Well, it was because I was wondering why we weren't getting paid for it if we didn't clock out for no lunch. You know, if you don't clock out for – if you clock out no lunch, I would figure that you would get paid for it because you weren't taking a lunch. So that's what I was more or less talking about. But they just kept saying, well, that's our policy. That's our policy.

Q. So you believe there were times where you clocked out no lunch and yet you still weren't paid for it?

A. I do believe so, yes.

10

(Lowther Depo. Pg. 83.)

### 3.    Carol Butler Deposition

Defendants deposed Ms. Butler on August 24, 2016. (Butler Depo. Pg. 1.)

#### i.    *Employees Never Took Lunch*

Ms. Butler testified that she and other employees were too busy to take lunch. (Butler Depo. Pg. 93-4). Ms. Butler stated that she "never" took a lunch break—"you never could. You didn't have time." (Butler Depo. Pg. 102.)

Ms. Butler explained that she knew other employees were not paid for lunch because they talked about it. (Butler Depo. Pg. 111.) Ms. Butler stated the following regarding her conversations about not taking lunch with other employees:

> A. Okay. It was always anytime you worked, people complained about not being - - being overworked and not having time to take a lunch or a break. I mean, that was just anywhere you went.

> Q. Can you recall any specific conversations with a certain person or a certain date or time?

> A. No certain date or time. It was something people talked about all the time. It was everywhere you went. Each floor I went to, people complained, and, you know, you're not getting a lunch. We're not getting a lunch. You know, just **it was a common denominator**.

(Butler Depo. Pg. 101.) (emphasis added.)

#### ii.    *Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch*

Ms. Butler complained to managers Ms. Riess, Michelle Brown, and Allison (last name unknown) about not getting to take a lunch and not getting paid. (Butler Depo. Pg. 52-6.) Ms. Butler expressed the following concerns:

> We're getting burnt out. We're concerned about patients' safety, care, because, you know, at this point, you're working constantly. You may get a drink of water,

11

you bring vegetables from home so you can -- you're basically grazing because you don't have time to eat. It's nonstop, it really is nonstop.

(Butler Depo. Pg. 56.)

Ms. Butler testified that she complained at monthly meetings about not being able to take a lunch. (Butler Depo. Pg. 46.) Ms. Butler testified that on two occasions she clocked out no lunch and Ms. Riess reprimanded her. (Butler Depo. Pg. 60, 66.) Ms. Riess "told [Ms. Butler she] should not clock out," and Ms. Riess "jumped onto [her] for doing that." (Butler Depo. Pg. 60.)

### iii.  *Inadequate Training*

Ms. Butler testified that she did not remember being trained on how to clock in or out during lunch. (Butler Depo. Pg. 46.) Ms. Butler testified to the following regarding training on the lunch timekeeping system:

Q. When you were first hired at Marietta, did you receive any training about how to clock in or out for lunch?

A. That was a long time ago, but I'm sure there was training. Do I remember distinctly?· I can't say -- I'm just going to say unsure because it was so long ago.

Q. At any time during your employment at Marietta, do you recall receiving training about how to clock in or out for lunch breaks?

A. Actually, I can't think of any time. I mean, seriously, I'm unsure, because I don't remember. We never took lunch breaks.· We couldn't, we were so busy.

(Butler Depo. Pg. 46.)

### 4.  **Stacy Hanlon**

Defendants deposed Stacy Hanlon on November 16, 2016. Ms. Hanlon testified that there were days when she did not get a 30-minute uninterrupted lunch and she did not cancel her lunch deduction. (Hanlon Depo., Pg. 26.) Ms. Hanlon testified she did not cancel her lunch deduction because "[i]t was made known it was frowned upon, that we weren't supposed to mess with our

12

hours." (*Id.*) Ms. Hanlon further testified that when she heard do not mess with your hours, she interpreted it to "mean, don't use the cancellation feature in the system." (Hanlon Depo., Pg. 28.) Ms. Hanlon did not remember receiving training on the lunch deduction policy or system. (Hanlon Depo., Pg. 30.) Ms. Hanlon did not remember ever using the cancel deduction option, even though she did not get a 30-minute uninterrupted lunch. (Hanlon Depo. Pg. 31.)

### 5.    Lynnett Myers' Deposition

Defendants deposed Lynette Myers on November 16, 2016.

#### i.    *Employees Never Took Lunch*

Ms. Myers testified that due to understaffing she was not able to take a 30-minute lunch break. (Myers Depo. Pg. 12:16-22). Ms. Myers further testified that she never got an uninterrupted 30-minute lunch break. (Myers Depo. Pg. 50-51:25-3.) Ms. Myers explained that she did not get an uninterrupted lunch the entire time she worked at Marietta Memorial Hospital. (Myers Depo. Pg. 112:7-13).

#### ii.    *Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch*

Ms. Myers testified that she was reprimanded by her unit coordinators, Allison Johnson and Mandy Riess, for clocking out no lunch on two separate occasions. (Myers Depo. Pg. 29:13-20) Ms. Myers further testified that Allison Johnson told her to not clock out no lunch. (Myers Depo. Pg. 33:1-4). Ms. Myers further explained that she clocked out no lunch again and Mandy Reiss reprimanded her for the second time. (Myers Depo. Pg. 33:15-18).

#### iii.    *No Lunches Ever Scheduled*

Ms. Myers testified that managers did not schedule lunches in accordance with the policy:

Q. Lets go to the next page, which is four, and the instructions section, which is 5.0. 5.1 reads that it's the responsibility of the manager to schedule lunches. And was that your understanding?

A. Yes.

Q. And were there any occasions when either of your managers actually scheduled your lunches?

A. No.

Q. Never happened?

A. Never happened.

(Myers Depo. Pg. 97:14-23.)

### iv.    Management Altered Payroll

Ms. Myers testified that she could not be sure if she got paid even for the times she cancelled the lunch deduction because management can go in and manipulate the hours. (Myers Depo. Pg. 33-34:25-10).

### v.    Worked Overtime

Over the course of her employment, Ms. Myers worked overtime. (Myers Depo. Pg. 16: 5-8.) Ms. Myers was not paid for overtime and had to call into HR to get it corrected. (Myers Depo. Pg. 12-18.)

### 6.    Kim Weckbacher's Deposition

Defendants deposed Ms. Weckbacher on January 19, 2017. (Weckbacher Depo. Pg. 1.)

### i.    Employees Never Took Lunch

Ms. Weckbacher testified at the deposition that she never got lunches. (Weckbacher Depo. Pg. 59:20-25). Ms. Weckbacher further testified that she was unable to get paid for her

interrupted lunches due to Defendants budget. (Weckbacher Depo. Pg. 60:4-9.) Ms. Weckbacher

stated the following at deposition:

> Q. All right. In a typical week, how many times were your lunches interrupted?
>
> A. Every day.
>
> Q. Was there any reason that you would be unable to get paid for those interrupted lunches?
>
> A. Budget.

(Weckbacher Depo. Pg. 60:1-6.)

Ms. Weckbacher testified to talking to coworkers about the lawsuit and discussing not

being able to take a lunch. (Weckbacher Depo. Pg. 145-146:12-15.) Ms. Weckbacher explained

that there were many employees with whom she spoke regarding working through lunch and this

lawsuit. (Weckbacher Depo. Pg. 145-156.)

### ii. Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch

Ms. Weckbacher testified that there are not enough nurses to be able to watch over

patients during lunch breaks. (Weckbacher Depo. Pg. 78:2-18.) Ms. Weckbacher explained that

during lunch periods she had to monitor 1-2 patients at a time. (Weckbacher Depo. Pg. 73-74:

18-7). Ms. Weckbacher testified that managers told employees not to clock out no lunch.

(Weckbacher Depo. Pg. 59.) Ms. Weckbacher testified that she knew cancelling her deduction

would not go over well with management even if she missed her lunch. (Weckbacher Depo. Pg.

61-62.)

### iii. *No Lunches Ever Scheduled*

Ms. Weckbacher testified that her manager never scheduled lunches. (Weckbacher Depo. Pg. 76:21-23, 87:14-19.) Ms. Weckbacher further testified that her manager, Susan Knotts, never scheduled lunches. (Weckbacher Depo. Pg. 92:12-16.)

### iv. *Inadequate Training on Lunch Policies*

Ms. Weckbacher testified that that she was not instructed on how the meal break system works. (Weckbacher Depo. Pg. 53: 10-13.) Ms. Weckbacher further testified that there was no training concerning meal breaks because they are not allowed to leave their department for lunch. (Weckbacher Depo. Pg.53:14-21.)

When discussing her training, Ms. Weckbacher testified to the following:

Q. And was there a time that you were instructed or trained on how the meal break system would work, the lunch breaks?

A. I don't believe so, no.

(Weckbacher Depo. Pg. 53: 10-13.)

### v. *Management Altered Payroll*

Ms. Weckbacher testified that there was no way for her to confirm if she was paid for clocking out no lunch. (Weckbacher Depo. Pg. 68:15-19.) Ms. Weckbacher stated that she complained she never got paid and never got lunches or paid for her time worked. (Weckbacher Depo. Pg. 59:20-25.) Ms. Weckbacher further testified that she could not tell on her paystub whether she was paid when she clocked out no lunch and HR could not clarify the issue. (Weckbacher Depo. Pg. 62:16-25).

### vi. *Overtime*

Ms. Weckbacher testified that she typically worked three fourteen hour shifts *i.e.,* 42 hours per week. (Weckbacher Depo. Pg. 62-64.)

### 7.     Josh Booth's Deposition

Defendants deposed Josh Booth on January 19, 2017.

#### i.     *Employees Never Took Lunch*

Mr. Booth testified that there are innumerable times where he had to chart and monitor during his lunch or did not get a lunch. (Booth Depo. Pg. 14:3-13.)

#### ii.     *Defendants' Underlying Policy and Practice of Not Allowing Employees to Take Lunch or Clock Out No Lunch*

Mr. Booth testified that he had multiple conversations over the years that established a culture where you should not cancel the lunch deduction, even if you do not get a lunch. (Booth Depo. Pg. 50:1-5) Mr. Booth further testified that management knows employee lunches are interrupted. (Booth Depo. Pg. 55:11-14.)

#### iii.     *No Lunches Ever Scheduled*

Mr. Booth testified that no one ever scheduled lunches. (Booth Depo. Pg. 49:15-18.)

#### iv.     *Inadequate Training*

Mr. Booth testified that he received very little to no training at all regarding how to clock out no lunch. (Booth Depo. Pg. 51:9-12.) Mr. Booth further testified that there were a lot of grey areas where he didn't know if he should clock out no lunch or not. (Booth Depo. Pg. 50-51:13-4.)

Mr. Booth testified to the following:

Q. Okay. So after four or five years working in this job, not knowing whether two minutes constitutes and interruption or not, why wouldn't you go to somebody and ask?

A. Because I think it goes back to the culture that's been created.

Q. Okay. You told me about a culture that was created in the last year; right?

A. I think, yeah. The last year.

Q. So how about before that, why didn't you ask the question?

A. Specifically? Because it goes back to the conversations that were had with numerous people at numerous times that said if you clock out no lunch on a regular basis, somebody's going to take notice. Just don't do it.

(Booth Depo. Pg. 60:10-25)

### 8. Mary Clegg's Deposition

Defendants deposed Mary Clegg on January 19, 2017.

#### i. *Employees Never Took Lunch*

Ms. Clegg testified that her lunches were interrupted at least 75 percent of the time. (Clegg Depo. Pg. 34:18-24). Ms. Clegg further testified that she always ate in the report room so she could watch the monitor. (Clegg Depo. Pg. 37-38:17-10). Therefore, even if her lunch was not interrupted by a patient, Ms. Clegg was still working during lunch, as she was watching heart monitors in the report room.

#### ii. *Inadequate Training*

Ms. Clegg testified that she does not recall any training regarding lunch breaks. (Clegg Depo. Pg. 34:1-3). Ms. Clegg further explained that she knew how to use the old Kronos System but not the new one. (Clegg Depo. Pg. 35-36:19:1). Ms. Clegg stated that she didn't know where to find things at on the new system and never clocked out no lunch on it. (Clegg Depo. Pg. 36:2-12).

#### iii. *Worked Overtime*

Ms. Clegg testified that she didn't get time and a half on her call after working 40 hours. (Pg. 81-82:7-1). Ms. Clegg further explained that when she talked to HR they told her that is how they did it. (Clegg Depo. Pg. 43:7-9).

**B.      Class Members Have A Likelihood of Success on the Merits Of Each Claim**

Plaintiffs bring this action on behalf of themselves and all similarly situated individuals for unpaid hours worked under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., the Ohio Minimum Fair Wage Standards Act ("MFWSA"), Ohio Rev. Code § 4111.03, *et seq*., the Ohio Prompt Payment Act O.R.C. § 4113.15, and common law unjust enrichment. The below demonstrates that Class members have likelihood of success on each of their underlying claims in this action.

**1.      FLSA**

*i.      Legal Framework*

The FLSA requires employers to pay their employees a minimum wage for all hours worked and to compensate their employees "at a rate not less than one and one-half times the regular rate" for each hour worked in excess of forty during a workweek. 29 U.S.C. §§ 206(a)(1), 207(a)(1). A plaintiff may establish liability for violations of the FLSA by adducing evidence that an employer-employee relationship existed, that the plaintiff was engaged in activities protected by the FLSA, and that the defendant did not pay the required minimum wage or 150% of the normal hourly rate for time worked in excess of 40 hours per week. *See, e.g., Thomas v. Speedway Superamerica, LLC*, 2006 U.S. Dist. LEXIS 15005, 2006 WL 4969500 (S.D. Ohio, March 31, 2006).

*ii.      Defendants' Pay Policy Illegally Places the Onus on the Employee to Maintain records*

Defendants' auto deduct lunch policy is illegal on its face because it places the onus on the employee to maintain records not the employer. Defendants' Personnel policy No. 80:05, 5.0 Instructions – Lunch Periods states as follows:

5.1 Scheduling of Lunch periods is the responsibility of the manager. A normal lunch Period is 30 minutes.
. . .

5.3 Employees are not permitted to eat in patient or public areas of the hospital.

5.4 Employees are not permitted to work their lunch period without permission of their Department Manager or Supervisor

> 5.4.1 Employees who are unable to take an uninterrupted lunch break due to work load will be instructed to **cancel** their lunch deduction by their supervisor or may be released from work 30 minutes early.

(Ex. E.) Thus, if an employee wishes to disrupt the inertia of the automatic time deduction, Defendants require him or her to correct his or her own time card or "cancel" the meal period deduction.

Defendants' policy discards its responsibility to make sure employees are paid for all hours worked. When an employer chooses to automatically deduct 30 minutes each day from its employees' pay, it is not enough for the employer to simply promulgate a rule that employees may not work during their lunch or that they have to report when their lunch is missed. *See* Dep't of Labor, Wage & Hour Div., Fact Sheet #53 – The Health Care Industry and Hours Worked (July 2009) (attached to Solomon Decl. at Exhibit F) (an employer who institutes an automatic meal break deduction "is still responsible for ensuring that the employees take the 30- minute meal break without interruption"). "The burden is on the employer to ensure the employees are receiving the full meal break and are not working, either actively or inactively, during that time." *Quickley v. Univ. of Md. Med. Sys. Corp.*, No. CCB-12-321, 2012 U.S. Dist. LEXIS 131280, at *14-15 (D. Md. Sep. 13, 2012) (citing 29 C.F.R. § 785.19(a) and noting that the employer must pay if the employee's meal break is "interrupted to the extent that the meal period is predominantly for the benefit of the employer"); *see* 29 C.F.R. § 785.13 ("[I]t is the duty of the

management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so."); *Roy v. Cnty. of Lexington*, 141 F.3d 533, 544 (4th Cir. 1998) (stating that the burden rests with the employer to demonstrate entitlement to mealtime payment exemptions under the FLSA); *Johnson v. City of Columbia*, 949 F.2d 127, 129-30 (4th Cir. 1991) (same); *Abendschein v. Montgomery Cnty.*, 984 F. Supp. 356, 359 (D. Md. 1997) (same).

This violation applies equally to all Class Members, and therefore Plaintiffs are likely to succeed on their FLSA claims.

### iii. *Defendants Failed to Pay Class Members for All Hours Worked in Violation of the FLSA*

In the instant action the record establishes that defendant failed to pay Class Member employees for all hours worked. The Sixth Circuit recently made clear that "if an 'employer knows or has reason to believe' that an employee 'is continuing to work' in excess of forty hours a week, 'the time is working time' and must be compensated at time-and-a-half, even if the extra work performed was 'not requested' or even officially prohibited. 29 C.F.R. 785.11." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 388 (6th Cir. 2016). "[A] 'reason to believe,' or constructive knowledge of something, exists when the employer 'should have discovered it through the exercise of reasonable diligence.'" *Craig*, 823 F.3d at 388 (quoting *Carlisle Equip. Co. v. U.S. Sec'y of Labor & Occupational Safety*, 24 F.3d 790, 793 (6th Cir. 1994)).

In the instant action, the evidence in support of Plaintiffs FLSA claim is voluminous. All of the evidence establishes that Defendants have completely failed to properly police their auto

21

deduct policy, resulting in Class Members not being paid for all hours actually worked including overtime. The Department of Labor has explained:

> [I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

*Id*. And, in the context of meal breaks, same rule applies. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion No. FLSA 2008-7NA (May 15, 2008) (attached to the April 1, 2010 Declaration of Patrick J. Solomon ("Solomon Decl."), Exhibit D) ("[T]he employer must compensate the employee for all . . . time worked during the missed meal period. . . . [T]ime worked because of a missed meal period is hours worked . . . 'it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed.'") (quoting 29 C.F.R. § 785.13); U.S. Dep't of Labor, Wage & Hour Div., Opinion No. FLSA 2007-1NA (May 14, 2007) (suggesting that an automatic meal break deduction system does not violate the FLSA "so long as the employer accurately records actual hours worked, including any work performed during the lunch period").

In this case, Defendants knew Class Members were entirely too busy to take a lunch because they were constantly attending to patient needs. (Myers Depo. Pg. 12; Booth Depo. Pg. 14; Weckbacher Depo. Pg. 78) Nevertheless, Defendants continued to automatically deduct unpaid lunch periods from Class Members' wages, even though they knew Class Members remained on duty during lunch. (Booth Depo. Pg. 14; Weckbacher Depo. Pg. 73-74; Clegg Depo. Pg. 37-38)

Indeed, Defendants took almost no affirmative steps to ensure Class Members were paid for all hours worked. Defendants did not adequately train Class Members on how to use the time

system. (Booth Depo. Pg. 51; Weckbacher Depo. Pg. 53; Clegg Depo. Pg. 34) Defendants did not schedule Class Members for lunch. (Myers Depo. Pg. 97; Booth Depo. Pg. 49; Weckbacher Depo. Pg. 76) Defendants did not order Class Members to cancel the automatic lunch deduction if they did not get lunch. (Booth Depo. Pg. 55) Defendants did not post signs next to timeclocks reminding Class Members to clock out no lunch. Defendant knew that Class Members worked overtime and therefore knew or should have known that any unpaid lunches would account for overtime hours. (Myers Depo. Pg. 16; Clegg Depo. Pg. 81) Defendants did not address Class Members complaints regarding the automatic lunch deduction and or not getting paid for all hours worked. (Weckbacher Depo. Pg. 59; Clegg Depo. Pg. 43) In fact, Defendants did the exact opposite—discouraging Class Members from canceling their deduction even when they did not get a lunch. (Myers Depo. Pg. 29)

Moreover, Defendants did not show Class Members on their paychecks whether they were actually paid if they canceled their lunch deduction. (Myers Depo. Pg. 33; Weckbacher Depo. Pg. 68) And, when Class Members asked if they were paid when they canceled the automatic deduction, Defendant could not even provide an explanation. (Weckbacher Depo. Pg. 62) Class Members left more confused than ever as to whether they were actually paid. (Myers Depo. Pg. 33-34; Weckbacher Depo. Pg. 68)

These facts are significant and compelling. The evidence leads to only one conclusion—Defendants violated the FLSA. Even if Defendants claim they did not know all these employees were not getting paid for all hours worked including overtime, reasonable diligence would have revealed the truth. Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits of their FLSA claims.

### 2. Ohio Minimum Fair Wage Standards Act

Ohio's minimum wage and hour statute, O.R.C. § 4111 *et seq.*, "expressly incorporates the standards and principles found in the FLSA," *Thomas v. Speedway SuperAmerica*, LLC, 506 F.3d 496, 501 (6th Cir. 2007) (citing Ohio Rev. Code § 4111.03(A)), and accordingly is interpreted similarly. Thus, whether the policies at issue here violate Ohio wage laws will be determined based on FLSA standards. Accordingly, because Plaintiffs have shown a likelihood of success on the FLSA claim above, Plaintiffs too have shown a likelihood of success on the Ohio Minimum Fair Wage Standard Act Claim. O.R.C. § 4111 *et seq.*

### 3. Ohio Revised Code § 4113.15

Section 4113.15 of the Ohio Revised Code, entitled "Semimonthly payment of wages" but known as Ohio's Prompt Pay Act, reads, in relevant part:

> (A) Every individual, firm, partnership, association, or corporation doing business in this state shall, on or before the first day of each month, pay all its employees the wages earned by them during the first half of the preceding month ending with the fifteenth day thereof, and shall, on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the preceding calendar month.

Ohio Rev. Code § 4113.15.

"This section of the Ohio Revised Code expressly mandates that employees be paid in a timely fashion and provides penalties for failure to promptly pay. Section 4113.15 is silent with respect to a minimum wage or overtime. It merely provides employees with a civil remedy if their employer fails to pay them their wages due within the time-frame prescribed therein." *Monahan v. Smyth Auto., Inc.*, No. 1:10-CV-00048, 2011 U.S. Dist. LEXIS 9877, at *12-14 (S.D. Ohio Feb. 2, 2011)

The key question for a claim under Section 4113.15 is did the employer fail to pay the employee wages for all hours worked within the prescribed time-frame? Here, the answer to that

24

question is no. The above facts demonstrate that Defendants have failed to pay class members for all hours worked. (Myers Depo. Pg. 12; Booth Depo. Pg. 55; Weckbacher Depo. Pg. 60; Clegg Depo. Pg. 37) Because Defendants have never paid class members for the wages due them, any remedy of this problem would be untimely under the act. Therefore Plaintiffs have established a prima facie case under Ohio Rev. Code § 4113.15 and all the evidence of record demonstrates a likelihood of success on the merits of this claim.

### 4. Unjust Enrichment

In Ohio, a plaintiff must establish the following three elements to prove unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 12 Ohio B. 246, 465 N.E.2d 1298, 1302 (Ohio 1984).

The facts above establish that Plaintiffs conferred a benefit upon Defendants by working their entire shift without taking lunch. (Weckbacher Depo. Pg. 60.) Defendants knew that Plaintiffs did not take lunch but failed to cancel the automatic lunch deduction to ensure Plaintiffs were paid for all hours worked. (Booth Depo. Pg. 55.) By failing to properly police the automatic lunch deduction policy, Defendants retained the benefit of Plaintiffs' work. To allow Defendants to retain the benefit of Plaintiffs' work without compensating them would be unjust.

### 5. Success on the Merits for Entire Class

There is a likelihood of success on the merits for the underlying claims of the entire class in this case. Plaintiffs have already demonstrated in their motion for class certification that this case is apt for class certification (ECF No. 74) and will not repeat those arguments in this

motion.[1] Plaintiffs, however, want to emphasize that the facts above and the testimony that will be elicited at the preliminary injunction hearing are sufficient to establish a likelihood of success on the merits for the entire underlying class of about one thousand nine hundred and fifty four (1,954) individual employees.

Under *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680 (1946), Plaintiffs can use representative testimony to establish a pattern and practice of Class Members working hours for which they are not compensated, and to establish damages. *See Takacs v. Hahn Auto. Corp.*, 1999 WL 33127976, *1 (S.D. Ohio Jan. 25, 1999) ("Based upon [*Mt. Clemons*] courts including the Sixth Circuit, have uniformly held that damages in an FLSA overtime case can be proved with testimony from a representative group of plaintiffs and, thus, without requiring each plaintiff seeking same to testify.").

The Supreme Court recently reaffirmed *Mt. Clemons* and the the use of representative testimony in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1040 (2016). *Tyson* is particularly persuasive here because the employees in *Tyson*, like the employees in the instant action, worked "in same facility, did similar work, and were paid under the same policy." *Tyson Foods, Inc.*, 136 S. Ct. at 1040. Accordingly, the record demonstrates a likelihood of success on the claims for the entire class.

---

[1] Plaintiffs refer the Court to their motion for class certification in order to demonstrate that class certification is appropriate in this action. (ECF No. 74.) Furthermore, the fact that many class members still work for Defendants "suggests that class resolution is superior." *Spencer v. No Parking Today, Inc.*, 2013 U.S. Dist. LEXIS 36357, at *109-11 (S.D.N.Y. Mar. 15, 2013); *see also Flores v. Anjost Corp.*, 284 F.R.D. 112, 131 (S.D.N.Y. 2012) ("Courts routinely hold that a class action is superior where . . . many potential class members are currently employed by Defendant."); *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 281 F.R.D. 100, 108 (E.D.N.Y 2011); *Torres v. Gristede's Operating Corp.*, 2006 U.S. Dist. LEXIS 74039, 2006 WL 2819730 at *16 ("[S]ince some class members are still employees of Defendants', **class members may fear reprisal and would not be inclined to pursue individual claims**.") (emphasis added).

II.    **Irreparable Harm**

A.    **Facts Related to Irreparable Harm**

The following facts detail Defendants' continued tactics that have coerced, intimidated, and harassed absent class members; and Defendants' other activities that have created an atmosphere of fear where class members are scared to join this lawsuit:

1.  Lynnett Myers and Carol Butler were retaliated against after engaging in protected activity and leaving their jobs at the hospital. Specifically, the hospital called Ms. Myers and Ms. Butler's new employer (Jackson Nursing) and told them that they could not hire them. Jackson Nursing subsequently revoked their offer of employment. (Myers Depo. 86:24-88) (Butler Depo. 37:4-11.)

2.  In opposition to Plaintiffs' motion for conditional class certification, Defendants engaged in unilateral ex-parte communications with potential class members in order to obtain affidavits. (ECF No. 17.) Plaintiffs filed an emergency motion asking the Court to prohibit Defendants from engaging in further unilateral communication due to the serious risk of coercion and misleading potential class members. (ECF No. 20.) In response to Plaintiffs' emergency motion, Defendants continued to gather more affidavits. (ECF No. 29.) Josh Booth testified in deposition that he was one of the individuals called down to sign an affidavit and that he felt intimidated. (Booth Depo. Pg. 21.)

3.  Four individuals have provided affidavits indicating that the Hospital has created an atmosphere of fear since Plaintiffs first sent out notice to a partial list of collective class members. (Ex. F., Affidavit of Mary Clegg; Ex. G, Affidavit of Melinda Johnson; Ex. H. Affidavit of Kim Weckbacher; Ex. I, Affidavit of Josh Booth.) This atmosphere of fear has discouraged class members from participating in this lawsuit. (*Id.*)

4. Since joining this lawsuit, Mr. Booth believes that he has been retaliated against. In essence, Mr. Booth contends that the hospital offered him a flex time job for additional hours to schedule his second job and to engage in therapy sessions with his special needs daughter. After joining this lawsuit, the hospital revoked the flex time job offer and Mr. Booth lost his health insurance at the hospital. (Booth Depo. Pg. 23-25.)

5. After the Court conditionally certified a collective class in this case, Ms. Weckbacher joined the lawsuit on October 2, 2016. On October 12, 2016, Ms. Weckbacher was fired and has since filed a related retaliation lawsuit. (Case No. 16-cv-1187.) Defendant continued to retaliate against Ms. Weckbacher by filing frivolous appeals to her unemployment claim (Case No. 16-cv-1187, *Complaint* ¶ 32) and by filing a meritless retaliatory counterclaim (Case No. 16-cv-1187, *Answer / Counterclaim*.)

6. Ms. Weckbacher testified at deposition to having conversations with multiple individuals about their fear of retaliation for joining the lawsuit. (Wechbacker Depo. Pg 145-152.)

7. Ms. Clegg testified at deposition that she thought there was an atmosphere of fear in her unit. (Clegg Depo. Pg. 57-58.)

8. Ms. Weckbacher and Ms. Clegg testified that Defendants hold "huddle meetings" in the morning where they announce who has been fired throughout the Hospital. (Clegg Depo. Pg. 20-21; Weckbacher Depo; Pg. 151-152.) These huddle meetings contribute to the atmosphere of fear. (*Id*.)

9. After deposing Ms. Weckbacher, Defendants went out and talked to three individuals Ms. Weckbacher named in her deposition. (Ex. J) Defendants asked these named individuals to fill out a form that specifically named Ms. Weckbacher and indicated that Ms. Weckbacher discussed them in deposition.

28

**B.** **Class Members Have Suffered Irreparable Harm and Will Continue To Suffer Irreparable Harm Unless the Court Intervenes**

The facts above establish that Defendants have engaged in coercive, misleading communications throughout this litigation and continue to engage in activities that intimidate absent class members and curtail participation in this litigation. As one district court explained, "because of the potential for abuses in collective actions, such as unapproved, misleading communications to absent class members, 'a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.'" *Belt v. Emcare, Inc.*, 299 F. Supp.2d 664 (E.D.Texas 2003), citing *Gulf Oil Company v. Bernard*, 452 U.S. 89, 100 (1981).  "'[A]ctual harm need not be proven'" to justify an order limiting class contacts, Plaintiffs need only present  evidence from which the Court can make a "finding of 'a likelihood of abuse.'" *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009) (quoting *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 633 (N.D. Tex. 1994)); *Burrell v. Crown Cent. Petroleum, Inc.,* 176 F.R.D. 239, 244 (E.D. Tex. 1997) (Rule 23 context).

The opt-in figures confirm the pervasiveness of this atmosphere of fear, which has dissuaded Class Members from participating in this lawsuit and vindicating their rights. Of the one thousand one hundred and sixty eight (1,168) notices that have been sent to collective class members only twenty five (25) employees listed as "current employees," have joined this case. Even more concerning is the fact that of the twenty-five current employees that joined the lawsuit, only twenty (20) still remain employed by Defendants. These numbers demonstrate the Class Members have not joined the lawsuit due to fear of reprisal. *See Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 342 (S.D.N.Y. 2004) (finding several hundred potential class members and only three opt-ins because of employees' fear of reprisal in joining FLSA collective action

and granting class certification); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 267 (D. Conn. 2002) (finding 281 potential class members and only 22 opt-ins demonstrated a fear of reprisal).

Defendants' most recent communications further demonstrate that an atmosphere of fear exists that has dissuaded individuals from joining the lawsuit. Secrecy and haste shrouded the Defendants' undertakings and neither the Court nor Plaintiffs' Counsel has been alerted to these actions. *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1201 (11th Cir. 1985). This evidence was obtained by Defendants' management and counsel by calling individual employees down to a room and having them sign documentation.[2] Communications of this type, between employee and employer have been found to be inherently coercive. *See Mevorah v. Wells Fargo Home Mortg., Inc.*, 2005 U.S. Dist. LEXIS 28615, *1, 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005). In *Mevorah*, the court explained that these types of conversations "have a heightened potential for coercion because where the absent class member and the defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive." *Id.* (quotations omitted). Other courts have echoed this sentiment. *See Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373 (S.D. Ga. 2009). In *Ojeda-Sanchez*, the court stated, "'[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable.'" *Id.* at 1379 (quoting *Kleiner*, 751 F. 2d at 1201).

Based on Defendants' record of coercive and intimidating tactics, their most recent unilateral communication tactics can only be considered improper, and an attempt to coax

---

[2] It is important to note that there is no evidence of record that Defendants gave the proper *Upjohn* warning during these meetings as required under *Upjohn Company v. United States*, 449 U.S. 383 (1981). In *Upjohn*, the Supreme Court required attorneys to inform employees during interviews that the attorney represents the company and not the employee, and that the employee is entitled to have counsel his or her own legal counsel. *Id.*

prospective class members into excluding themselves from the litigation. Defendants' actions send a clear message—if you participate in this litigation, or even if someone you know participates, then you will be subject to intense and uncomfortable scrutiny aimed at getting you not to participate in this lawsuit. Even worse, the document they are having absent class members fill out specifically names Ms. Weckbacher (or presumably whoever gave up the name). The only logical conclusion to be made from this evidence is that Defendants tactics have created a culture of fear that discourages participation in this lawsuit and discourages reporting of FLSA violations in general.

Tellingly, of the three documents produced by Defendants, two individuals indicated they had not been paid for all hours worked—Gina Tucker and Mary Goode. (Ex. J) Neither Ms. Tucker nor Ms. Goode opted into this lawsuit, although the document they signed clearly demonstrates they have legitimate claims for unpaid wages. The only conclusion that can be made from this evidence is that these individuals were scared to join the lawsuit. And Plaintiffs expect Ms. Goode to testify to this fact at the preliminary injunction hearing.

Moreover, the document that Defendants had employees sign is misleading. (Ex. M.) The district court's decision in *Gonzalez v. Preferred Freezer Servs. LBF, LLC*, 2012 U.S. Dist. LEXIS 139764, *1, 2012 WL 4466605 (C.D. Cal. Sept. 27, 2012) is particularly instructive here. In *Gonzalez*, the court found a document that the defendant had absent class members sign misleading because it (1) "did not include any information regarding th[e] class action, except that a former employee had brought it"; (2) "did not include [the plaintiff's] counsel's contact information"; (3) "even when [the defendant's] agents spoke to potential plaintiffs, the agents never provided them with the name of the case"; (4) and the defendant's counsel "never contacted [the plaintiff's] counsel to confer over possible communication". *Id.* *4.

The document in this case is misleading for all the reasons stated in *Gonzalez.* The document includes very little information about the lawsuit or why the employee is being asked questions; it does not discuss or contain contact information for Plaintiffs' counsel; and Defendants never contacted Plaintiffs' counsel to confer over these communications. For these reasons, the communication was misleading.

Last, Defendants' most recent communications have an even more chilling effect in light of the fact the entire class has not yet received notice. At least seven hundred and ninety two (792) class members have not received opt-in notice. Although this Court conditionally certified a collective class on August 17, 2016 (ECF No. 42), notice has not gone yet to the entire class. In its order (ECF No. 42), the Court required Defendants to provide a list of "[a]ll of Defendants' current and former hourly employees who were responsible for direct patient care and were subject to Defendants' automatic meal deduction policy at any time during the three years prior to the granting of this motion to the present." (ECF No. 42, at 20.)

Defendants, however, did not provide a complete class list and only provided names of nurses and nursing techs. (Ex. P, First Class List.) After multiple failed attempts to get a complete list from Defendants, Plaintiffs approached the Court and asked it to require Defendants to comply with its previous order. (ECF No. 47.) On January 12, 2017, the Court granted Plaintiffs' motion and required Defendants to provide a complete list. (ECF No. 91.) Defendants did not provide a complete class list until February 24, 2017. (ECF No. 42, at 20.)[3]

While delaying notice, Defendants cultivated and firmly established a culture of fear. As such, when a large number of class members receive notice (at least 792 individuals), they will certainly be scared to join the lawsuit due to the atmosphere of fear. Allowing Defendants to

---

[3] Plaintiffs are still uncertain whether this class list is complete. Defendants' Counsel has, as of this date, not responded to an email sent February 24, 2017 requesting verification the list is complete and accurate. (Ex. K.)

continue unilateral communications with absent Class Members will only further discourage participation in this lawsuit.

Accordingly, Plaintiffs have demonstrated irreparable harm and the Court should therefore **GRANT** this motion.

## III.    <u>Substantial Harm to Others</u>

Defendants will not suffer harm if the Court if it remains enjoined from communicating with potential / absent Class Members. This Court already granted Plaintiffs motion for a temporary restraining order and issued an injunction prohibiting communication. (ECF No. 101.) Defendants drafted the language of the injunction and Plaintiffs' Counsel made no changes to the proposed draft.

Moreover, Defendants will not be harmed with respect to an inability to respond to Plaintiffs' motion for class certification. The Court set a March 1, 2017 cut-off for discovery Defendants needed to respond to Plaintiffs motion for a class certification. (ECF No. 91.) The Court issued a temporary restraining order in this case on March 3, 2017. (ECF No. 101.) As such, Defendants should have finished any discovery or investigation needed in order to respond to Plaintiffs class certification motion before the Court issued a TRO.

Accordingly, the injunction, as it stands, is narrowly tailored to ensure protection of Defendants' right to operate its business and carry out the important work of a hospital. Therefore, this factor weighs in favor of Plaintiffs and the Court should **GRANT** Plaintiffs' motion.

## IV.    <u>The Public Interest Will Be Served By Issuing the Injunction</u>

This element heavily favors Plaintiffs. The FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours. *Barrentine v.*

*Arkansas-Best Freight System*, 450 U.S. 728 (1981). Recognizing that there are often great inequalities in bargaining power between employers and employees, Congress made the FLSA's provisions mandatory; thus the provisions are not subject to negotiation or bargaining between employers and employees. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945).

Indeed, the public interest always favors the preservation of FLSA rights. The Supreme Court has "frequently emphasized the non-waivable nature of an individual employee's right . . . to overtime pay under the Act." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981). FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Id.* (internal quotation marks omitted).

In this case, the evidence demonstrates that individuals are scared to join or participate in a lawsuit for which there is a likelihood of success on the merits. Defendants should be enjoined from engaging in activity that has the effect of causing employees to waive their FLSA rights. Accordingly, the Court should **GRANT** Plaintiffs' motion.

## CONCLUSION

As demonstrated above, all four preliminary injunction factors weigh in favor of granting Plaintiffs' motion. The damage done by Defendants may very well be irreversible. Nonetheless, the Court can and should take action to limit future damage and mitigate the substantial damage that has already occurred. Accordingly, Plaintiffs request the following relief:

- First, the Court should issue an order enjoining Defendants from engaging in any further unilateral meetings or communications with absent class members regarding this lawsuit.

- Second, the Court should re-open the opt-in period for the entire class of 1,954 individuals.

34

- Third, the Court should send corrective notice to those collective class members that have already received notice (Corrective Notice 1). This notice should be sent in the form of a letter from the Court. The letter should (1) detail Defendants' improper, coercive, and intimidating actions; (2) inform class members that retaliation is illegal; and (3) inform class members that the Court will take appropriate actions if the Defendants continue to engage in coercive, intimidating tactics.

- Fourth, the Court should add language to the notice form being sent out to those collective class members that have not yet had an opportunity to join this lawsuit (Corrective Notice 2). This notice will add language that (1) indicates the Court is aware of the fact that Defendants have engaged in tactics that discourage participation in this lawsuit; (2) informs class members that retaliation is illegal; and (3) informs class members that the Court will take appropriate actions if the Defendants continue to engage in coercive, intimidating tactics.

- Fifth, the Court should order Defendants to bear the cost associated with sending notice.

- Sixth, the Court should award Plaintiffs' Counsel attorneys' fees and costs associated with (1) compelling Defendants to provide a complete class list; (2) the temporary restraining order; and (3) the preliminary injunction.

For the reasons stated herein, the Court should **GRANT** Plaintiffs' motion. Furthermore, the Court should award the relief requested above.

Respectfully Submitted,

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.    (0093584)
Lance Chapin            (0069473)
Chapin Legal Group, LLC
580 South High Street, Suite 330
Columbus, Ohio  43215
Telephone:    614.221.9100
Facsimile:    614.221.9272
E-mail:   sbabin@chapinlegal.com

Attorneys for Plaintiffs
Lynnett Myers, *et al.*

**Certificate of Service**

I hereby certify that on this the 17th day of March, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of this electronic filing to the following:

James E. Davidson
James.davidson@icemiller.com
Ice Miller
250 West Street
Columbus, OH 43215
Telephone: 614.462.2700
Facsimile: 614.462.5135
Counsel for Defendant

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr.        (0093584)
Chapin Legal Group, LLC
Attorney for Plaintiffs Lynnett Myers, *et al.*