**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Lynnett Myers, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:15-cv-2956 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| Memorial Health System | : | Magistrate Judge Terence P. Kemp |
| Marietta Memorial Hospital, | : | |
| | : | |
| Defendant. | : | |


## <u>DEFENDANTS' MOTION TO DECERTIFY THE CONDITIONAL CLASS</u>


Dated:  April 18, 2017          <u>        /s/ James E. Davidson        </u>
                                                   James E. Davidson (0024534)
                                                   James.davidson@icemiller.com
                                                   Catherine L. Strauss (0072980)
                                                   Catherine.Strauss@icemiller.com
                                                   250 West Street
                                                   Columbus, OH 43215
                                                   Telephone: 614.462.2700
                                                   Facsimile: 614.462.5135

CO\5542555.4

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

II.  STATEMENT OF FACTS.....................................................................................2

    A.  Marietta Hospital. ...........................................................................................2

    B.  Plaintiffs' Employment with the Hospital. .....................................................2

    C.  The Hospital Automatically Deducts 30 Minutes for Lunch Breaks. ...............4

    D.  The Hospital's Lunch Policy Allowed Plaintiffs to Cancel Their Automatic Deductions...5

    E.  The Hospital Paid Nurses Who Cancelled Their Automatic Deductions..........................6

    F.  The Hospital Trained Plaintiffs on How To Cancel the Automatic Deduction and Plaintiffs Routinely Cancelled the Automatic Deductions. ..............................................7

    G.  The Plaintiffs Routinely Cancelled the Automatic Deduction and the Hospital Paid For Their Interrupted Meal Breaks. .....................................................................................8

    H.  Aside From an Isolated Instance, Plaintiffs Testified that the Hospital Did Not Discourage or Discipline Them For Cancelling Their Automatic Deduction...................................9

    I.  The Plaintiffs Often Chose Not to, or Forgot to, Cancel Their Automatic Deduction, and Did Not Inform the Hospital or Keep Records of Allegedly Interrupted Lunches. .......11

III. LEGAL ARGUMENT ..........................................................................................13

    A.  Standards For Section 216(b) Certification ...................................................13

    B.  The Putative Class Member's Employment Settings Vary Greatly ..................14

        1. Plaintiffs' Job Duties Are Wide Ranging and Diverse..................................14

        2. For Similar Reasons, Supervision Varies Greatly Among Plaintiffs ...........................15

        3. Testimony by Representative Plaintiff, Lynnett Myers, Establishes Substantial Differences in Her Experience Compared to Others....................................................16

        4. Being Subject to the Same Policy is Insufficient to Support Collective Treatment.......17

    C.  The Hospital's Various Defenses Are Individual to Each Plaintiff and Circumstances ....17

        1. The Hospital's Published Policy is Lawful...................................................17

        2. Policies Which Put the Onus on the Employee to Correctly Report Their Time Worked Are Legal ......................................................................................................................20

    3.  There is No Evidence of an Unwritten Practice in Contravention of the Legal and Uniformly Applied Policy..................................................................................................22

    4.  Individualized Rebuttal Evidence Is Needed to Refute Plaintiffs' Claims........................22

D.   Fairness and Procedural Considerations Militate Against Proceeding as a Collective Action ............................................................................................................23

IV.  CONCLUSION...........................................................................................................28

CO\5542555.4

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baldridge v. SBC Communications, Inc.*, 404 F.3d 930 (5th Cir. 2005)........................................14

*Bayles v. Amer. Med. Response of Colorado, Inc.,* 950 F.Supp. 1053 (D. Colo. 1996).................1

*Bonilla v. Las Vegas Cigar Co.*, 61 F.Supp.2d 11296 (D. Nev. 1999).......................................22

*Cameron v. Grant-Maxim Healthcare Services, Inc.,* 347 F.3d 1240 (11th Cir. 2003) ...............13

*Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. CIV.A. 09-85J, 2011 WL 6372873 (W.D. Pa.
    Dec. 20, 2011) ............................................................................................................21

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339(N.D. Ill. 2012).........................21

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382 (6th Cir. 2016).........................................20

*Deppen v. Detroit Med. Ctr.*, No. 10-12229, 2011 WL 2847405 (E.D. Mich. July 19, 2011) .....21

*Frye v. Baptist Memorial Hospital, Inc.,* 495 Fed.Appx. 669 (6th Cir. 2012) . 13, 14, 17, 20, 22, 23

*Guillaume v. Select Med. Corp.*, No. 12-CV-80447, 2013 WL 121011344 (S.D. Fla. Nov. 4,
    2013)..........................................................................................................................21

*Holzapfel v. Town of Newburgh*, 145 F.3d 516 (2d Cir.1998) ...................................................18

*Home Depot Overtime Cases*, Case No. E040215 (Cal. Fourth App. Dist. 2007) ........... 26, 27, 28

*In re Chevron U.S.A., Inc.,* 109 F.3d 1016 (5th Cir. 1997) ....................................... 23, 24, 25, 26

*Jones-Turner v. Yellow Enter. Sys., LLC*, No. 3:07-CV-00218-CRS, 2014 WL 1320008 (W.D.
    Ky. Mar. 31, 2014) ....................................................................................................18

*Myers v. Critter Control, Inc.*, No. CIV.A. 12-0015-N, 2012 WL 6062059, (S.D. Ala. Dec. 6,
    2012)..........................................................................................................................21

*Norceide v. Cambridge Health All.*, No. CIVA 10-11729-NMG, 2014 WL 775453 (D. Mass.
    Feb. 24, 2014) ............................................................................................................20

*O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567 (6th Cir. 2009) ...................................14

*Reyes v. Texas EZPawn, L.P.*, 2007 WL 101808 (S.D. Tex. 2007) ............................................17

*Smith v. Heartland Automotive Servs*, 404 F.Supp.2d 1155 (D. Minn. 2005) ............................23

*White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012).......18, 19, 20, 23, 28

*Wood v. Mid-Am. Mgmt. Corp.*, 192 F. App'x 378 (6th Cir. 2006) ..............................................18

**Other Authorities**

29 C.F.R. § 785.11 ....................................................................................................18

29 USC § 216.............................................................................................................13

iv

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Lynnett Myers, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:15-cv-2956 |
| | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| Memorial Health System | : | Magistrate Judge Terence P. Kemp |
| Marietta Memorial Hospital, | : | |
| | : | |
| Defendant. | : | |

### DEFENDANTS' MOTION TO DECERTIFY THE CONDITIONAL CLASS

"[A] collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use such a device in a case where proof regarding each individual plaintiff is required to show liability." *Bayles v. Amer. Med. Response of Colorado, Inc.,* 950 F.Supp. 1053, 1065 (D. Colo. 1996)

## I.      INTRODUCTION

Plaintiffs should not be rewarded for declining to self-report their interrupted lunches. All of the evidence demonstrates that the Hospital implemented a facially neutral policy that permitted employees to report, and be paid for, interrupted lunch breaks. Notwithstanding that policy, Plaintiffs failed to self-report interrupted lunches even though they recognized that the Hospital had no knowledge of their omissions. Because the applicable cases in the healthcare industry bar claims by nurses who knowingly fail to self-report compensable time, these Plaintiffs are incapable of representing a Rule 216(b) Class.

A more fulsome record now reveals that Plaintiffs cannot meet their burden of demonstrating that they are similarly situated to others. Numerous factors about the composition

1

of the conditional class and the job functions each person performs weigh against collective treatment. For similar reasons, the Hospital will be subject to proffering as many defenses as there are Plaintiffs. Simply put, the Hospital is entitled to attack the credibility of any person who knowingly failed to report an exception. The failure to self-report will likely give rise to an absolute defense, which should not apply to absent members who may have legitimate claims. Those absent members' claims will be tainted by representative testimony on the failure to self-report. Thus, collective treatment cannot yield a fundamentally fair process for any party. For these reasons, this Court should grant the Hospital's Motion and decertify the collective action.

## II.   STATEMENT OF FACTS

### A.   Marietta Hospital.

Memorial Health System operates Marietta Memorial Hospital ("the Hospital"). [Weaver Dec., ¶5].[1] Memorial Health System also operates Selby General Hospital, Belpre Emergency Department, and numerous outpatient-related centers providing various services. [Weaver Dec., ¶6]. The Hospital is divided into several units and departments. [Weaver Dep. 45:13-15].[2]

### B.   Plaintiffs' Employment with the Hospital.

The Named Plaintiffs[3] conditionally represent a class of nurses and other staff such as nurse assistants or patient care technicians who engage in direct patient care at the Hospital.[4] For example, Plaintiff Stacy Hanlon ("Hanlon") worked as a certified nurse assistant ("CNA")

---

[1] All references to "Weaver Dec." are to the March 1, 2016 Declaration of Mr. Dan Weaver, Director of Human Resources for the Hospital, and whose declaration is attached at **Exhibit A**.

[2] References to the "Weaver Dep." are to the March 17, 2017 Fed. R. Civ. P 30(b)(6) Deposition of Marietta Memorial Hospital, filed with the Court on Mar. 28, 2017 at ECF # 116-1.

[3] The Named Plaintiffs in this matter are Lynnett Myers ("Myers"), Carol Butler ("Butler"), and Arva Lowther ("Lowther").

[4] The term "Plaintiffs" refers to the conditionally certified class of employees providing direct patient care - nurses, patient care technicians and other hospital employees in more than 100 categories of jobs - who have either opted-in or for whom the notice period remains open.

[Hanlon Dep. 11:22-12:4][5], while Myers, Butler, and Lowther were registered nurses ("RN"), [Lowther Dep. 17:1-17:4[6]; Butler Dep. 24:6-24:9[7]; Myers Dep. 13:12-13:23[8]]. The Plaintiffs worked in several different units of the Hospital. Some worked in the PICU, while others worked in Division F or telemetry, which specializes in patients with heart problems. [Butler Dep. 25:15-26:1; Lowther Dep. 51:9-51:12, 143:12-143:19; Myers 20:12-20:15][9]. Others worked in the OB unit. [Weckbacher Dep. 34:25-35:1;[10] Clegg Dep. 17:11-17:14]. Nurses working in these different units attended to various numbers of patients at a time. [*Compare* Lowther Dep. 57:1-5 (assigned three to four patients at a time in the PICU or Division F), *with* Weckbacher Dep. 73:23-74:1 (labor and delivery, assigned one to two patients)].

The Plaintiffs also worked a variety of shifts. [*See, e.g.*, Lowther Dep. 19:6-19:8 (night shift); Clegg Dep. 31:10-31:15 (day shift and night shift); Myers Dep. 20:19-21:4 (weekend shift)]. The managers and charge nurses who oversaw Plaintiffs varied from year to year, and person to person. [Lowther Depo 23:12-23:14 (manager was Mandy Riess); Myers Dep. 12:20-12:21 (Sue McDonald and later Mandy Riess); Weckbacher Dep. 43:24-43:25 (manager was

---

[5] References to the "Hanlon Dep." are to the Dec. 6, 2016 Deposition of Stacy Hanlon, filed with the Court on Mar. 17, 2017 at ECF # 109-1.

[6] References to the "Lowther Dep." are to the Aug. 23, 2016 Deposition of Arva Lowther and filed with this Court on April 17, 2017.

[7] References to the "Butler Dep." are to the Aug. 24, 2016 Deposition of Carol Butler and filed with this Court on April 17, 2017.

[8] References to the "Myers Dep." are to the Dec. 6, 2016 Deposition of Lynnett Byers, filed with the Court on Mar. 17, 2017 at ECF # 109-2.

[9] References to the "Weckbacher Dep." are to the Feb. 7, 2017 Deposition of Kim Weckbacher, filed with the Court on Mar. 17, 2017 at ECF # 110-1.

[10] References to the "Clegg Dep." are to the Feb. 7, 2017 Deposition of Mary Clegg, filed with the Court on Mar. 17, 2017 at ECF # 110-3.

CO\5542555.4

Susan Knotts); (Booth Dep. 12:1-12:7 (manager was Juanita Duff); (Booth Dep. 10:25-11:1 (manager is Amy Pinkerton)][11].

### C. The Hospital Automatically Deducts 30 Minutes for Lunch Breaks.

The Hospital's published policy plainly states that employees are to be scheduled for a 30-minute lunch break. [Weaver Dec., ¶7]. This policy is explained in the Hospital's Personnel Policy No. 80:05 relating to Hours of Work at 3.1.5: "[l]ike all employees working more than a 4 hour shift, a 30 minute lunch is automatically assumed to be part of all employee's shifts." [Weaver Dec., ¶8, Ex. 1].[12]

Plaintiffs understood that the Hospital's policy entitled them to a 30-minute uninterrupted lunch break. For example, Weckbacher knew that if she "took just a minute" out of her lunch, that would be considered an interruption, and she would be entitled to payment for the lunch break. [Weckbacher Dep. 88:14-89:19].

When they were able to find a co-worker to cover their patients, Plaintiffs took lunch breaks. Clegg would take lunch breaks when she could "based on the needs of the day" and would eat in the report room. [Clegg Dep. 33:2-8, 37:20-22]. Likewise, Hanlon "got the benefit of the full 30 minutes" for lunch. [Hanlon Dep. 26:9-11]. Other nurses would ask the charge nurse to watch their patients and walk to the cafeteria to buy lunch. [Weckbacher Dep. 76:24-77:4]. Still others would go to the cafeteria for food, bring it back to the nurses' station and eat the food as the worked. [Myers Dep. 98:14-99:2].

Plaintiffs allegedly met with their supervisors to tell them that they could not take a lunch break. [Butler Dep. 58:23-59:4]. For example, Butler testified that she met with her manager

---

[11] References to the "Booth Dep." are to the Feb. 7, 2017 Deposition of Joshua Booth, filed with the Court on Mar. 17, 2017 at ECF # 110-2.

[12] Employees who work in emergency care are not scheduled a 30-minute break because of the nature of emergency care. [Weaver Dec., ¶8, Ex. A].

and explained that she "didn't have time to take a break or lunch.  We voiced that, but nothing else was said."  [*Id.*].  Lowther also met with her supervisors and discussed her concerns with staffing at the hospital.  [Lowther Dep. 94:5-95:1].  They did not inform their supervisors that they believed that they were not compensated for missing their meal breaks. [*See, e.g.*, Clegg, Dep. 84:15-18 ("Q. Were there days when you told your nurse manager that you should be paid for your lunch, that she didn't override the deduct? A. Not that I am aware of, no.")]

> **D.**     **The Hospital's Lunch Policy Allowed Plaintiffs to Cancel Their Automatic Deductions.**

The Hospital permits, and encourages, its employees "to do a no lunch deduct or cancellation" if they do not get a lunch.  [Weaver Dep. 28:19-29:5].  Employees use the Kronos timekeeping system to cancel their meal break deductions.  [Weaver Dec., ¶¶16, 17].  Upon clocking out, each employee may self-select "Cancel all meal deductions."  [Weaver Dec., ¶16].

Additionally, the Hospital also provides clear guidance to managers on how to complete the payroll process once an employee has notified them of an interrupted break.  [Weaver Dec., ¶19, Ex. 5].  As set forth in Policy 7.1.26, managers should use an earning code, titled NO LUNCH, which provides:

> 7.1.26 No Lunch – Applies to scheduled shifts (of at least 5.5 hours) in which the employee was unable to take a lunch break. Employees must notify their Manager for approval.  At the option of the Manager, the work day can be shortened in order to avoid the additional paid time.

[Weaver Dec., ¶20, Ex. 5].

These policies are available at any time on the Hospital's intranet.  [Weaver Dec., ¶22]. Plaintiffs could access these policies from a terminal at the Hospital at any time.  [Weaver Dep. 45:6-45:15].  The Plaintiffs often used the intranet site to find Hospital policies on similar issues. [*See, e.g.*, Hanlon Dep. 40:20-25; Myers Dep. 76:11-21; Weckbacher Dep. 82:15-83:3].

5

**E.**      **The Hospital Paid Nurses Who Cancelled Their Automatic Deductions.**

The Hospital's policy, published as Personnel Policy No. 40:01, is to pay employees for their lunch break when they are unable to take an uninterrupted lunch break due to work load. [Weaver Dec., ¶13, Ex. 2].  The provision states: "1.2.1.1 Employees who are unable to take an uninterrupted lunch break due to work load will be paid for that time."  [Weaver Dec., ¶13, Ex. 2].

In addition, the Hospital provides clear guidance on how employees should be compensated for interrupted breaks.  [Weaver Dec., ¶14, Ex. 1].  Specifically, Policy No. 80:05 explains:

> 5.0    Lunch – Lunch Periods
>
> > 5.1  Scheduling of lunch periods is the responsibility of the Manager. A normal lunch period is 30 minutes.
> >
> > 5.2  The cafeteria is provided for employees to bring their lunch, as well as those who purchase it.
> >
> > 5.3  Employees are not permitted to eat in patient or public areas of the hospital.
> >
> > 5.4  Employees are not permitted to work their lunch period without permission of their Department Manager or Supervisor.
> >
> > 5.4.1      Employees who are unable to take an interrupted lunch break due to work load will be instructed to cancel their lunch deduction by their supervisor or may be released for work 30 minutes early.
> >
> > 5.5  Employees leaving the building during lunch must time stamp out, time stamp back in when returning and call MyMemorial Absence Line at 1-855-306-8837.

[Weaver Dec., ¶15, Ex. 1].

CO\5542555.4

**F.**    **The Hospital Trained Plaintiffs on How To Cancel the Automatic Deduction and Plaintiffs Routinely Cancelled the Automatic Deductions.**

The Hospital provided Plaintiffs training on its lunch break policy during the Plaintiffs' orientations.  It distributed "a handbook and---with [the Hospital's] policies in it."  [Myers Dep. 38:22-24, 42:2-9 (the handbook contained the lunch break policies)].  Myers specifically testified that she remembered that the Hospital provided training on "the lunch policy, break policy" during orientation.  [Myers Dep. 42:1].  Similar to Myers, Booth testified that he understood from the orientation that he was entitled to a 30-minute lunch break, which he could cancel.  [Booth Dep. 15:18-16:4; *see also* Clegg Dep. 67:19-24 (received instruction during orientation on how to cancel automatic deduction)].

Plaintiffs also signed acknowledgements affirming that they had reviewed and received the lunch break policy.  [*See, e.g.*, Lowther Dep. 59:22-61:24 (reviewed policies regarding "Break Periods, Lunch Periods, Reporting No Lunch"); Booth Dep. 66:15-67:11; Clegg Dep. 67:6-24; Myers Dep. 105:3-105:20; Butler Dep. 48:3-50:1; Hanlon Dep. 35:21-37:2].  Moreover, it is the Hospital's policy to ensure that "[a]ll employees receive [the lunch break policies] as part of orientation training."  [Weaver Dec., ¶13, Ex. A].

Plaintiffs also knew how to cancel the automatic lunch break deduction.  Booth testified that he had "no confusion" that he could override the automatic deduction.  [Booth Dep. 18:20-18:23].  Likewise, other Plaintiffs knew that if their lunch was interrupted they could override the automatic deduction.  [Weckbacher Dep. 56:20-23 ("Yes, I was aware of that."); Lowther Depo, 40:19-41:1].  Further, the Hospital declarants also uniformly testified they knew that they

could be compensated for interrupted lunch breaks by either their manager or through the self-reporting procedure. [Employee Declarations, Ex. B, ¶6].[13]

### G. The Plaintiffs Routinely Cancelled the Automatic Deduction and the Hospital Paid For Their Interrupted Meal Breaks.

Plaintiffs understood that they could cancel their automatic deductions when they missed a meal break. [*See, e.g.*, Lowther Dep. 165:12-14 ("Q. So you know how to clock out no lunch, correct? A. Well, yes."); Weckbacher 57:3-57:8 ("I did use it occasionally.")]. Plaintiffs' understanding of this rule is supported by the Hospital's exception reports, which catalogued each time an employee cancels an automatic deduction.

These reports show that Lowther cancelled her deduction 163 times in a two-year period. [Lowther Dep. 163:17-165:14; Weaver De., Ex. 7]. Likewise, Booth cancelled his automatic deduction forty-eight times over a three-year period. [Booth Exception Report, attached as Exhibit C]. The exception reports for the other Plaintiffs paint a similar story. [Clegg Exception Report, attached as Exhibit D (two cancellations); Myers Exception Report, Weaver Dec., Ex. 9 (eighteen cancellations)]. Furthermore, Hospital records indicate that employees cancelled their automatic deductions approximately 40,000 times in 2015, and over 100,000 times from 2013-2015. [Weaver, 37].

Some employees cancelled their lunch breaks but did not understand whether or not the Hospital paid them for the missed lunch. [Myers Dep. 110:21-110:25; Weckbacher Dep. 71:12-71:16; Lowther Dep. 40:11-40:12]. Accordingly, they knew that they could cancel their automatic deductions and were simply confused as to whether the Hospital had paid them for their lunch.

---

[13] Attached as **Exhibit B** is a spreadsheet listing the name and position of each declarant along with a copy of each declaration.

The Hospital paid Plaintiffs for their lunch every time they cancelled their automatic deduction. [*See, e.g.*, Weaver Dep. 34:18-20 ("And then if [the lunch break is] interrupted, it would be paid, obviously."); Butler Dep. 85:20-85:23; Booth Dep. 55:3-55:6]. In addition to Plaintiffs' testimony, twenty-nine current employees submitted declarations confirming that they were properly paid: "For my entire tenure as a Hospital employee, I have been properly paid for every day that I have worked. I have never performed work for which I have not been compensated." [Employee Declarations, Ex. B, ¶4]. Moreover, the Hospital paid out more than $400,000 for cancelled lunches. [Weaver, 37].

> **H.    Aside From an Isolated Instance, Plaintiffs Testified that the Hospital Did Not Discourage or Discipline Them For Cancelling Their Automatic Deduction.**

The Hospital's managers and charge nurses did not instruct the Plaintiffs to cancel their automatic meal break deductions. Booth testified that no one in management ever told him, directly or indirectly, that he should not override the automatic deduction. [Booth Dep. 19:18-22]. Similarly, when asked "Did anybody ever tell you that you were not permitted to override the automatic deduction?" Weckbacher answered "No." [Weckbacher Dep. 59:14-19; *see also id.* 60:15-17 (Weckbacher also did not know anyone who was disciplined for overriding the automatic deduction)]. Said differently, Weckbacher agreed that the Hospital did not have a policy that "prevented [her] from getting paid for interrupted lunch[es]." [*Id.* 100:1-6]. Clegg's testimony is consistent with Booth's and Weckbacher's:

> Q. Did anybody with the hospital ever tell you, for one reason or another, that you weren't allowed to override the automatic deduct?
>
> A. Not that I can recall, no.

[Clegg Dep. 38:20-23].

A handful of Plaintiffs complained that one manager, Mandy Riess, allegedly told them not to cancel their automatic deductions, which the Hospital denies. [Lowther Dep. 42:10-11; Myers Dep. 29:13-23; Butler 64:18-65:13]. Importantly, the Plaintiffs admitted in their depositions that their decision not to cancel their automatic deduction was not caused solely by Riess' alleged directions. For example, Myers testified that she "didn't know the exact date" when Riess allegedly told her not to cancel her automatic deduction. [Myers Dep. 114:2-5]. However, Myers voluntarily chose whether to cancel her automatic deduction in the time preceding Riess' meeting, but could not say why she did not cancel the automatic deductions before she was allegedly reprimanded. [Myers Dep. 112:3-6].

Finally, while some Plaintiffs claimed that they were afraid to use the automatic deduction out of fear, they did not have a basis for that fear. For example, one Plaintiff testified that she was simply "very easily intimidated." [Clegg Dep. 19:20-25]. Myers testified that she was afraid of retaliation, but did not know any instances of retaliation to substantiate that fear. [Myers Dep. 90:18-20]. Likewise, Booth testified that he did not "know of any specific experiences" of retaliation relating to employees cancelling their automatic lunch deduction. [Booth Dep. 20:10-21].

Plaintiffs knew how to inform management that they were not receiving a lunch break, but did not. The Hospital has an open door policy that permits employees to submit complaints to their managers or to human resources. Additionally, employees can submit grievances "to anyone in management" including the CEO. [Weaver Dep. 58:11-17]. Further, Myers testified that she knew that she could make hotline calls anonymously. [Myers, Dep. 106:9-19 (she is "not sure why" she did not take advantage of the hotline); *see also* Lowther Dep. 130:6-9 (had "heard about" the hotline, but never used it)].

I.      **The Plaintiffs Often Chose Not to, or Forgot to, Cancel Their Automatic Deduction, and Did Not Inform the Hospital or Keep Records of Allegedly Interrupted Lunches.**

Plaintiffs testified that they often forgot to cancel their automatic deductions at the end of their shift. Weckbacher stated that there were times when she forgot to use the override. [Weckbacher Dep. 61:17-62:3; *see also* Myers Dep. 112:23-113:2 (Myers did not cancel her automatic deduction because she "forgot to clock out no lunch before clocking out.")].

Other Plaintiffs chose not to override their automatic deductions. Butler testified that she knew how to clock out she "just didn't do it." [Butler Dep. 71:8-9]. Likewise, Clegg testified that there were times when her lunch was interrupted but she did not override the automatic deduction. Her reasoning for not overriding the deduction was:

A.      . . . [T]o me, when I'm thinking lunch break, I think, well as long as I get to sit down and eat my lunch. So I wasn't thinking, you know, that every little interruption was taking away from my lunch. Do you know what I mean?

Q.      So that was a personal choice on your part not to --- or to accept the fact that you might have a little interruption and it wasn't worth overriding?

A.      **Well, I just didn't think about it at the end of the day, because I knew I ate my lunch.**

\* \* \*

Q.      And did that ever happen, that your lunch would be interrupted because of a patient issue?

A.      Yes.

Q.      And when that happened, did you remember to override the automatic deduct?

A.      No. Because I --- like I said, **it just didn't cross my mind as long as I knew I ate my lunch.** That's to me, in my mind, I got my lunch because I ate.

Q.      Did anybody tell you that it was the hospital's policy that as long as you ate lunch, you shouldn't override the automatic deduct?

A.      No.

[Clegg Dep. 36:25-38:19 (emphasis added)].

Nevertheless, Plaintiffs recognized that it was their responsibility to cancel their automatic lunch deduction because their supervisor could not reasonably know when they missed a lunch.  Tellingly, Weckbacher agreed that "where [she was not] paid for an interrupted break, [she was] the person who controlled whether [she] got paid or not."  [Weckbacher Dep. 102:9-103:11 (adding "Q. There's nobody else out there who would have put in that automatic deduct for you; right? . . .  A. Yes.")].

Likewise, Clegg agreed that her supervisor would not know which nurses worked through their lunches and which did not if:

Q.      If you didn't tell your supervisor that you worked through lunch or your lunch was interrupted, how would she know?

* * *

A.      Well, I mean, there's days where she was right there, but most of the time she wasn't.  I mean, like, on a busy day, she knew it was busy.  **But I don't know that she necessarily knew who got their lunch or who didn't get their lunch.**

Q.      And she wouldn't know who exercised the override in the system, either?

A.      Well she would know that, because she's the one who went through the payroll.

Q.      So she'd have to keep track of everybody during the course of the shift and reconcile that as she looked at payroll?

A.      I would assume, like, when she did her payroll --- it was on Mondays --- and she would look through everything.

Q.      **She'd have to remember what everybody did the prior week; right?**

A.      **I guess so.**

Q.      Was there anybody else that was in a position to know that you didn't get your lunch and you were not getting paid?

12

> A.    I mean, they might know that we weren't able to get lunch, because normally, if one person wasn't able to get lunch, the whole unit wasn't able to get lunch. So, but, **I don't think anybody knew from person to person who clocked in their lunch or who didn't.**

[Clegg Dep. 61:17-62:22 (emphasis added)].

Finally, Plaintiffs could not provide testimony explaining which days they did not receive an uninterrupted 30-minute lunch break. Some claimed that they were interrupted every day. [Weckbacher Dep. 60:1-3]. Others were interrupted "frequently," but not every day. [Clegg Dep. 34:18-35:1]. Moreover, Plaintiffs could not specifically recall what days they chose not to cancel their deduction. For example, Booth could not "recall dates or specific times" when he was "interrupted during lunch" and was allegedly not paid. [Booth Dep. 14:3-7]. Similarly, Hanlon "couldn't even hazard a guess" as to how many days she worked and had her lunch break interrupted. [Hanlon Dep. 30:913]. Weckbacher "know[s]" that there were times when she "forgot to use the override." [Weckbacher Dep. 61:17-23].

## III.    LEGAL ARGUMENT

### A.    <u>Standards For Section 216(b) Certification.</u>

The FLSA permits plaintiffs to proceed "for and in behalf of . . . themselves and other employees similarly situated." 29 USC § 216(b). Congress amended the FLSA in 1947 to include Section 216(b) of the Act "to 'prevent [ ] large group actions, with their vast allegations of liability, from being brought on behalf of employees who had no real involvement in, or knowledge of, the lawsuit.'" *Cameron v. Grant-Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1248 (11th Cir. 2003)(citations omitted). Thus, the FLSA countenances the maintenance of a "collective action" only upon a showing that there are individuals who desire to "opt-in" to the suit and that these individuals are "similarly situated." *See, Frye v. Baptist Memorial Hospital, Inc.,* 495 Fed.Appx. 669 (6th Cir. 2012). The FLSA does not, however, define "similarly

situated," nor does it specify the procedure for certifying an action as a "collective action" under Section 216(b).

The Sixth Circuit has articulated the factors courts should consider in determining whether a plaintiff is sufficiently similarly situated to warrant collective treatment, namely: "the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action."  *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009).

An order certifying a collective action under Section 216(b) of the FLSA is subject to revision and possible decertification at any time before the trial court addresses the merits.  *See, Baldridge v. SBC Communications, Inc.*, 404 F.3d 930 (5th Cir. 2005) (Order conditionally certifying collective action is not a collateral order appealable as of right, since the order can be modified before trial).

**B.**   **The Putative Class Member's Employment Settings Vary Greatly.**

Clearly, context, individual circumstances, and shades of degree all matter.  Accordingly, this first factor examines the opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if they are similarly situated. *See Frye* at 270.

*1.  Plaintiffs' Job Duties Are Wide Ranging and Diverse.*

The conditionally certified class consists of dozens of positions ranging from nurses on hospital floors, nurses in clinic settings, respiratory therapists who travel to locations within in the Hospital to see patients, and radiologists who work in a setting where patients are seen briefly and for a limited purpose.  There is nothing uniform, common or typical about these varying jobs and ways in which they are performed.  Those working on the hospital unit floors

14

have primary responsibility for patients throughout their 12-hour shift. These nurses and patient care technicians remain on the floor at all times, are the conduit between physicians, patients and their families, have sole responsibility for charting, ensuring timely receipt of medications, testing and other required medical services, and are responsible for dealing swiftly with emergencies.

Other job functions are more predictable. Respiratory and occupational therapists see patients in their rooms for short periods of time ranging up to 30 minutes, but the nurses working those floors are still primarily responsible. Patients may be transported to radiology or other testing locations for a discrete and limited time. Those who receive these patients perform a discrete function and have the patients transported back to their unit floor. These procedures are usually scheduled, thus providing a predictable routine for employees in these jobs.

Finally, the most predictable of jobs are those nurses and caregivers working in clinic settings where patients come for a scheduled appointment to follow-up on care previously provided or needed in the future. These employees work in non-emergency situations with detailed schedules of patient appointments which provide a high level of predictability for lunch breaks.

In sum, the more than 100 job titles comprising the conditional class are too vast and different to treat uniformly and collectively.

### 2. *For Similar Reasons, Supervision Varies Greatly Among Plaintiffs.*

At present, there are 105 opt-in Plaintiffs and another 1,900 class notice recipients. These employees are supervised by many different supervisors with different specialties in different locations throughout the Hospital network. Those nurses and patient care technicians working the Hospital in-patient floors work twelve-hour shifts, approximately three days a week.

15

They may have a different day supervisor each shift.  In addition, employees providing testing services, such as radiology or pulmonology, have different supervisors.  What is certain is that with a potential class of 2,000 employees, many supervisors are implicated.  Accordingly, any practice to circumvent the facially lawful policy of deducting lunch breaks will amount, at best, to individual claims involving their specific job and supervisor.

### 3. Testimony by Representative Plaintiff, Lynnett Myers, Establishes Substantial Differences in Her Experience Compared to Others.

Lynnett Myers is a named Plaintiff.  In her Amended Complaint, Myers acknowledges that she is bringing this action on behalf of the other nurses who are similarly situated to her.  However, Myers' experience at the Hospital is anything but standard or similar.  Myers worked as a nurse caring for overnight patients on the unit floor.  She voluntarily resigned before filing this lawsuit.  She utilized the Hospital's system of cancelling her lunch break at least 18 times.  [Weaver, Ex. 9].  Accordingly, she was compensated for those interrupted breaks.  She testified that she was trained on the policy and knew how to use the simple system.  [Myers Dep., 42:1].  However, she claims to have a rogue supervisor who instructed her not to cancel her lunch deductions.  [Myers Dep., 114:2-5].  She did not inform Human Resources or use the internal Hospital dispute resolution system to address the issues.  While she may have an individual claim, she is not 'similarly situated' to those who did not report to the same supervisor.  More than 100,000 cancellations of lunch deductions by Hospital employees in 2013, 2014 and 2015 demonstrate that other employees were trained on the system, understood it, used it and were paid for interrupted breaks.  [Weaver, 37].

### 4. *Being Subject to the Same Policy is Insufficient to Support Collective Treatment.*

The only policy and practice to which Plaintiffs can point in support of collective treatment of their claims is the Hospital's published policy permitting employees to cancel their lunch deduction when their meal break is interrupted. Nonetheless, the mere fact that members of a putative class hold the same job title and are subject to the same published policy cannot, alone, support the maintenance of a collective action. *Cf., Reyes v. Texas EZPawn, L.P.*, 2007 WL 101808, at *4 (S.D. Tex. 2007) ("[O]ther than the global allegations of Plaintiffs that the FLSA was violated, that they were all ASMs for EZPawn at some point, and that they primarily performed non-exempt work, there is no real commonality among the Plaintiffs in their actual day to day job duties.").

### C. <u>The Hospital's Various Defenses Are Individual to Each Plaintiff and Circumstances.</u>

The second factor addresses the issue of whether the employer's potential defenses pertain to the opt-in class as a whole or whether different defenses will be raised with respect to each individual plaintiff. *Frye*, 495 Fed.Appx. at 670. The District Court has the discretion to decertify on this basis alone where the potential defense would make the class unmanageable. *Id.* Here, discovery has revealed that Plaintiffs' claims and the Hospital's defenses to those claims turn on the particular facts and circumstances surrounding each Plaintiff's experiences.

### 1. *The Hospital's Published Policy is Lawful.*

Under the FLSA, employers are not required to compensate employees for uninterrupted meal break time. Courts define compensable work time, as opposed to uninterrupted meal break time, as any time when the employee: (1) worked predominantly for the employer's benefit, (2) was not able to pursue his or her mealtime adequately or comfortably, and (3) where the

CO\5542555.4

employer knew or had reason to know that the employee was working. *See White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (citing 29 C.F.R. § 785.11). Minor, *de minimus*, interruptions beyond what the employer has scheduled do not constitute compensable work for the purpose the FLSA. *White*, 699 F.3d at 873 (must only compensate for "substantial" amounts of his or her time).

Moreover, "'an employer cannot suffer or permit an employee to perform services about which the employer knows nothing.'" *Wood v. Mid-Am. Mgmt. Corp.*, 192 F. App'x 378, 380 (6th Cir. 2006) (quoting *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir.1998)); *Jones-Turner v. Yellow Enter. Sys., LLC*, No. 3:07-CV-00218-CRS, 2014 WL 1320008, at *5 (W.D. Ky. Mar. 31, 2014). Most importantly, an employee's failure to "follow reasonable time reporting procedures . . . prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White*, 699 F.3d at 876.

The instant case is nearly identical to *White v. Baptist Memorial Health Care, supra.* There, the court affirmed summary judgment for the hospital-employer, which automatically deducted a lunch break from its employees' pay checks. *White*, 699 F.3d at 872. Marietta Memorial's policy and practice is functionally identical to Baptist. *See White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1100242, at *4 (W.D. Tenn. Mar. 23, 2011), *aff'd*, 699 F.3d 869 (6th Cir. 2012) (employer's policy automatically deduced meal breaks from employees' compensation, and the employer "compensated employees for all hours worked" by paying employees for missed or interrupted meal breaks).

In *White,* the hospital gave plaintiff a handbook, which included the employer's policies and instruction on how to report overtime performed during her lunch break. *White*, 699 F.3d at 872. Further, the employee signed a document stating that she received and understood the meal

break policy. *Id.* In this case, the Hospital provided the same training and resources to its employees:

- It distributed its lunch break policies to the Plaintiffs during orientation. [Myers Dep. 38:22-24, 42:2-9, ECF # 109-2; Booth Dep. 15:18-16:4, ECF # 110-2; Clegg Dep. 67:19-24, ECF # 110-3].

- It trained the Plaintiffs on how to cancel their automatic deduction. [*See, e.g.*, Myers Dep. 42:1, ECF # 109-2; Booth Dep. 15:18-16:4, ECF # 110-2; Clegg Dep. 67:19-24, ECF # 110-3].

- Plaintiffs also signed acknowledgement forms indicating that they received training from the Hospital. [Lowther Dep. 59:22-61:24, Ex. __; Booth Dep. 66:15-67:11, ECF # 110-2; Clegg Dep. 67:6-24, ECF # 110-3; Myers Dep. 105:3-105:20, ECF # 109-2; Butler Dep. 48:3-50:1, Ex. __; Hanlon Dep. 35:21-37:2, ECF # 109-1].

Further, the plaintiff in *White* understood how to report missed meal breaks, and often did so. *White*, 699 F.3d at 872. Likewise, the Plaintiffs in this case routinely cancelled their automatic deductions. [*See, e.g.*, Lowther Exception Report, Ex. 7 to Weaver's Declaration (163 cancellations in approximately two-year period); Booth Exception Report, Ex. C (48 cancellations over three years); Myers Exception Report, Ex. 9 to Weaver's Declaration (18 cancellations from October 2013 to November 2015); Clegg Exception Report, Ex. D (two cancellations)]. Further, Hospital employees in the aggregate cancelled their automatic deductions more than 100,000 times in 2013, 2014 and 2015. [Weaver, 37].

Eventually, the plaintiff in *White* simply "stopped reporting her missed meal breaks in the exceptions log," and could not remember, and did not have records, of which breaks were allegedly interrupted and uncompensated. *White*, 699 F.3d at 872. The same is true here, where the Plaintiffs chose to stop cancelling their automatic deduction, and had no recollection of which meal breaks they allegedly worked through. [Weckbacher Dep. 61:17-62:3, ECF # 110-1; *see also* Myers Dep. 112:23-113:2 (Myers did not cancel her automatic deduction because she "forgot to clock out no lunch before clocking out."), ECF # 109-2].

19

The court in *White* affirmed summary judgment for the employer, holding "if an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." *Id.* at 876. Accordingly, the relevant standard transforms from "I know that the employee was working" into "I know the employee was working and not reporting his time." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 389 (6th Cir. 2016) (citing *White*, 699 F.3d at 876).

Here, Plaintiffs control the relevant information as they are required to self-report interruptions. There was no way for the Hospital to know if Plaintiffs were not compensated for working during their meal breaks. Accordingly, Plaintiffs cannot show that they suffered or were permitted to work without compensation for two independently fatal reasons.

### 2. Policies Which Put the Onus on the Employee to Correctly Report Their Time Worked Are Legal.

In the Sixth Circuit, the mere burden associated with an automatic meal break deduction is insufficient to sustain a collective action. *See, e.g., White, supra*, at 876 ("When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA."); *Frye, supra*, at 672 ("an automatic-deduction policy, without more, does not violate the FLSA.").

Other jurisdictions routinely reach the same result. See, e.g., *Norceide v. Cambridge Health All.*, No. CIVA 10-11729-NMG, 2014 WL 775453, at *3 (D. Mass. Feb. 24, 2014) (granting defendant hospital's motion to decertify a class of hospital employees, including nurses, on the basis that "[i]t was also **lawful** for [the employer] automatically to deduct time for

meal breaks **and to shift the burden to employees to report when their meal breaks were missed or interrupted**." (emphasis added)); *Guillaume v. Select Med. Corp.*, No. 12-CV-80447, 2013 WL 12101134, at *4 (S.D. Fla. Nov. 4, 2013) (upholding an automatic meal deduction for nurses and stating "Plaintiff was in the best position to prove she worked during her mealtime; **'[t]o require ... [Defendants] to prove a negative—that an employee was not performing 'work' during a time reserved for meals—would perversely incentivize employers to keep closer tabs on employees....'**"(emphasis added)); *Myers v. Critter Control, Inc.*, No. CIV.A. 12-0015-N, 2012 WL 6062059, at *4 (S.D. Ala. Dec. 6, 2012) (affirming an employer's right to utilize an automatic meal deduction where the employee could inform the employer that he worked through his meal break); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 344 (N.D. Ill. 2012) (granting defendant's motion to decertify a group of nurses where defendants automatically deducted 30 minutes of work time from every non-exempt nurse employee who works a shift lasting at least 7.5 hours, unless the employee indicates that he or she did not receive a meal period.); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. CIV.A. 09-85J, 2011 WL 6372873, at *1, 4 (W.D. Pa. Dec. 20, 2011) (granting defendants' motion to decertify a class of nurses subject to an automatic meal deduction policy and noting "a growing consensus of federal courts has rejected the notion that collective action treatment of automatic deductions is warranted under an FLSA 'burden-shifting' theory"); *Deppen v. Detroit Med. Ctr.*, No. 10-12229, 2011 WL 2847405 (E.D. Mich. July 19, 2011) (rejecting a nurse's FLSA claims based on an automatic meal deduction policy).

### 3. There is No Evidence of an Unwritten Practice in Contravention of the Legal and Uniformly Applied Policy.

To be "similarly situated" means that "'there is a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]." *Bonilla v. Las Vegas Cigar Co.*, 61 F.Supp.2d 1129, 1138 n.6 (D. Nev. 1999) (citations omitted). Although similarly situated plaintiffs need not be identical, "a plaintiff cannot proceed in a collective action if 'the action relates to other specific circumstances personal to the plaintiff rather than any generally applicable policy or practice.'" *Id.*

### 4. Individualized Rebuttal Evidence Is Needed to Refute Plaintiffs' Claims.

Plaintiffs contend that they had interrupted lunch breaks for which they were not properly paid and there was a practice or policy preventing them from cancelling the automatic lunch deduction. To rebut each of Plaintiff's contentions, the Hospital will necessarily call upon competing witness testimony or individual employment records. *See Frye*, at 672-673. Thus, the Hospital may effectively rebut these contentions through the testimony of other employees who supervised or worked with each individual Plaintiff. The Hospital may also use each individual Plaintiff's employment records, including their individual Exceptions Reports showing each self-reported exception to the automatic lunch deduction. Thus, the Hospital will call witnesses that are particular to each Plaintiff and further, will rely on that Plaintiff's own Exceptions Report – which will establish that the individual either claimed compensation for missed breaks or knew how to claim compensation, but failed to do so. Such evidence is particular to each Plaintiff and will not be representative of any common theme or practice. See Frye, at 672-673.

22

Further, since the holding in *Baptist Memorial*, *supra*, necessarily bars a claim that an individual simply forgot to self-report, the testimony of the representative Plaintiffs will actually cause harm to any person who claims that their ability to self-report was discouraged by a supervisor. Assuming, *arguendo*, that such persons have viable claims, those claims will be extinguished by collective treatment.

**D.** **Fairness and Procedural Considerations Militate Against Proceeding as a Collective Action.**

The third certification factor examines whether a collective trial could be effectively managed consistent with the goal of efficient resolution of common issues of law and fact and whether fairness and procedural considerations militate in favor of or against determining Plaintiffs' claims collectively rather than individually. *See Frye*, at 670.

If decertification is granted, the Plaintiffs will be able to take advantage of the significant discovery already conducted when pursuing their individual claims. *See Smith v. Heartland Automotive Servs*, 404 F.Supp.2d 1155 (D. Minn. 2005) (granting defendant's motion for decertification and finding that many plaintiffs 'have likely benefited from the implementation of class-wide consolidated discovery as to many of the issues relevant to their FLSA claims'). The Court can also dismiss the opt-in Plaintiffs without prejudice, exercise its equitable powers to toll the statute of limitations, and allow those individuals time to re-file individual claims. *See Heartland*, 404 F.Supp. at 1155.

In *In re Chevron U.S.A., Inc.,* 109 F.3d 1016 (5th Cir. 1997), the Fifth Circuit granted Chevron's petition for mandamus insofar as it related to the district court's trial plan, which contemplated utilization of the results obtained from the trial of thirty selected cases for any purpose affecting the issues, claims, or defenses of the remaining cases in mass tort proceedings involving over 3,000 plaintiffs. In the Fifth Circuit's view, the district court's plan lacked the

23

"core element" of "representativeness" with respect to those cases selected for trial. *Id.,* at 1019. Instead, the trial plan was "simply a trial of fifteen (15) of the 'best' and fifteen (15) of the 'worst' cases contained in the universe of claims involved in this litigation." *Id.* As the Court explained:

> A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness -- that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained. Such samples are selected by the application of the science of inferential statistics. The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole. The applicability of inferential statistics has long been recognized by the courts.
>
> The selected thirty (30) cases included in the district court's "unitary trial" are not cases calculated to represent the group of 3,000 claimants. Thus, the results that would be obtained from a trial of these thirty (30) cases lack the requisite level of representativeness so that the results could permit a court to draw sufficiently reliable inferences about the whole that could, in turn, form the basis for a judgment affecting cases other than the selected thirty.

*Id.,* at 1019-20 (citations omitted). The Court went on to hold that "before a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected." *Id.,* at 1020. "Typically, such a finding must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole." *Id.* As the Court explained:

> It is such findings that provide the foundation for any inferences that may be drawn from the trial of sample cases. Without a sufficient level of confidence in the sample results, no inferences may be drawn from such results that

24

would form the basis for applying such results to cases or claims that have not been actually tried.

*Id.*

The concerns expressed in *In re Chevron, supra*, about the use of "representative" testimony involve fundamental notions of procedural and substantive due process:

> [W]hen such a common issue trial is presented through or along with selected individuals' cases, concerns arise that are founded upon considerations of due process. Specifically, our procedural due process concerns focus on the fact that the procedure embodied in the district court's trial plan is devoid of safeguards designed to ensure that the claims against Chevron of the non-represented plaintiffs as they relate to liability or causation are determined in a proceeding that is reasonably calculated to reflect the results that would be obtained if those claims were actually tried. Conversely, the procedure subjects Chevron to potential liability to 3,000 plaintiffs by a procedure that is completely lacking in the minimal level of reliability necessary for the imposition of such liability. Our substantive due process concerns are based on the lack of fundamental fairness contained in a system that permits the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs. Such a procedure is inherently unfair when the substantive rights of both plaintiffs and the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result.

*Id.*, at 1020-21. Ultimately, as the Court noted, the issue is one of "fundamental fairness." *Id.*, at 1021. "The elements of basic fairness contained in our historical understanding of both procedural and substantive due process . . . dictate that when a unitary trial is conducted where common issues, issues of general liability, or issues of causation are coupled with a sample of individual claims or cases, the sample must be one that is a *randomly* selected, *statistically significant* sample." *Id.* (emphasis added).

The Hospital recognizes that the Court does not contemplate the use of bellwether trials *per se*. The due process concerns addressed in *In re Chevron, supra* apply, however, with equal (if not greater) force to collective treatment of Plaintiffs' claims. By proceeding collectively, the Court must assume that it will be able to make a factual finding that *all* of the 100 plus Plaintiffs

25

were not compensated for all of their time worked.  Proceeding in such a fashion is rife with due process pitfalls.

As in *In re Chevron, supra,* there is nothing "representative" or "random" about the evidence likely to be presented at trial.  Based on the current record, it is reasonable to surmise that all of the 100 plus opt-in plaintiffs cancelled the auto-lunch deduct at some point during their tenure at the Hospital.  This simply highlights the fact that determining whether any particular Class member had an interrupted lunch break and subsequently cancelled their automatic lunch deduction involves an individualized, fact-specific determination.  A finding in favor of, or adverse to, the opt-in class would either grant judgment for undeserving parties or deny compensation to persons who may have legitimate claims.

A California Appellate Court's decision in *Home Depot Overtime Cases*, Case No. E040215 (Cal. Fourth App. Dist. 2007) illustrates the fundamental tension that exists between the individual nature of "wage and hour" exemptions and the use of "representative" evidence in collective or class action proceedings.  In support of their motion for class certification, the plaintiffs in *Home Depot* submitted the declaration of their expert, who opined that "the ultimate issue of executive exemption can be decided on a representative class basis, using documentary evidence and representative testimony without examining actual work activities and individual testimony."  *Id.*, at 8.  In affirming the trial court's decision denying class certification, the Appellate Court, quoting the trial court's ruling, stated that "Home Depot has a fundamental due process right to raise affirmative defenses as to individual plaintiffs.  This right . . . in conjunction with the individual nature of damages in this case makes it difficult to see how class certification would substantially benefit the court."  *Id.,* at 11.  The Appellate Court, again quoting the trial court at length, further explained the due process pitfalls inherent in attempting

to determine the exempt or non-exempt status of individual employees on the basis of "representative" evidence:

> Given that the test for entitlement to overtime will come down to a decision as to whether 50.1 percent of time is spent on non-exempt or exempt work, a basic fairness concern arises in the use of the class action procedure. It is the plaintiffs['] clearly articulated position that if 50.1 percent of MASMs are doing non-exempt work a majority of the time, everyone in the class presumptively is entitled to overtime. Likewise, if 50.1 percent of MASMs are engaged in exempt work a majority of the time, no one in the class recovers. Theoretically, this would result in a potential windfall to 49.9 percent of the population of MASMs, or a deprivation to 49.9 percent of MASMs deserving overtime pay. . .

*Id.*, at 15 (footnote added). This same potential for an unfair windfall lurks here.

The Court's decision to proceed collectively also treats the Hospital unfairly to the extent that it allows the Plaintiffs to avoid the inherent credibility question presented here, which is why they claim compensation, while, at the same time, they have also claimed exceptions for interrupted breaks. Therefore, individual impeachment issues are prevalent. Among many examples, the recent Preliminary Injunction hearing showed that Mr. Booth offered false testimony when he testified in his deposition that he had not recorded conversations in the Hospital. His own counsel established the falsity of that testimony by framing a question that was predicated on the representation that he possessed tapes of conversations recorded by Mr. Booth[14]. Again, the Court in *Home Depot*, *supra*, commented on this concern:

> Representative sampling does not address individual credibility. As previously noted, Plaintiffs' declarants describe their work as non-exempt; Home Depot's declarants see their work as exempt. Also, Home Depot has taken the deposition of approximately 16 of plaintiffs' declarants and in several instances; there has been significant impeachment. In addition to issues of basic honesty, depending on point of view, a MASM may in good faith describe a task differently. If a MASM is stocking shelves with a number of hourly associates, one MASM may see their role as supervisory, which is an exempt activity, while another MASM might describe it as simply stocking shelves, a non-exempt activity. At some

---

[14] The transcript of the Preliminary Injunction hearing has not yet been prepared. The record will be supplemented when the reporter has completed the transcript.

27

> point, a trier of fact will have [to] make individual decisions on these
> characterizations and credibility.

*Id.,* at 13-14. To proceed with collective treatment of individual claims will impair the Hospital's right to conduct effective cross-examination. A reasonable factfinder could conclude that credibility issues with one or more Plaintiffs is not "representative" of other Plaintiffs who do not appear. In other words, if certain individuals are shown to be untrustworthy because of individual circumstances, why should a jury conclude that other persons are either credible or not?

Kim Weckbacher was terminated for legitimate business reasons after she opted-in. [Weckbacher, 26]. Regardless of whether her termination was lawful, these facts inherently relate to her credibility and potential bias. Another Plaintiff, Joshua Booth, elected to resign after he opted in because the Hospital learned he was taking FMLA leave to work at another job. [Booth, 33]. Again, these particular facts are directly relevant to Booth's credibility and potential bias. As just two examples demonstrate, such issues are *inherently* individual to each Plaintiff and the Court cannot render a fair determination on a class-wide basis.

## IV. CONCLUSION

*White v. Baptist Memorial* serves to bar the claims asserted by most of the testifying Plaintiffs. To that end, any person who "forgot" to report interrupted meals or who claims that she could not take thirty seconds at the end of a shift to note an exception, fails to assert a legally cognizable claim for relief. As class representatives, those persons will extinguish any legitimate claims that absent class members may arguably possess.

Moreover, the record now reflects that over $1,200,000 in exceptions were paid. The representative Plaintiffs submitted exceptions and were paid for that time. They are not in a

position to offer testimony for any individuals who did not claim exceptions. Therefore, the Court should decertify the conditional class.

Respectfully submitted,

By:  ICE MILLER, LLP

Dated:  April 18, 2017

_/s/ James E. Davidson_____
James E. Davidson (0024534)
James.davidson@icemiller.com
Catherine L. Strauss (0072980)
Catherine.Strauss@icemiller.com
250 West Street
Columbus, OH 43215
Telephone: 614.462.2700
Facsimile: 614.462.5135

CO\5542555.4

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 18th day of April, 2017, the foregoing was filed using the Court's

CM/ECF system and will be served via the Court's CM/ECF filing system, on the following:

Lance Chapin
Steven Babin
Chapin Legal Group, LLC
580 South High Street, Suite 330
Columbus, Ohio 43215
614.221.9100
lchapin@chapinlegal.com
sbabin@chapinlegal.com

Attorney for Plaintiff


*/s/ James E. Davidson*_____