IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LYNNETT MYERS, *et al.*, | : | |
| | : | Case No. 2:15-cv-2956 |
| Plaintiffs, | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge Kemp |
| MEMORIAL HEALTH SYSTEM | : | |
| MARIETTA MEMORIAL | : | |
| HOSPITAL, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. (Doc. 112.) Based on the testimony and evidence presented at the March 30, 2017 Preliminary Injunction Hearing, and for the reasons set forth below, Plaintiffs' Motion is **GRANTED in part and DENIED in part**.

### I. BACKGROUND

#### A. Factual Background

This is a wage and hour lawsuit brought by named Plaintiffs Lynnett Myers, Carol Butler, and Arva Lowther, on behalf of themselves and all similarly situated individuals,[1] against Defendants Memorial Health System, Marietta Memorial Hospital, and Selby General Hospital (collectively, "Defendants") for alleged violations of the Fair Labor Standards Act ("FLSA"), the Ohio Minimum Fair Wage Standards Act ("MFWSA"), Ohio Revised Code Section 4113.15, and Ohio common law. Plaintiffs' underlying claims center on Defendants' automatic lunch

---

[1] The class conditionally certified under the FLSA by this Court is: "All of Defendants' current and former hourly employees who were responsible for direct patient care and were subject to Defendants' automatic meal deduction policy during the three years prior to the granting of [the class certification] motion to the present." (Doc. 42 at 20.)

1

deduction policy. According to Plaintiffs, Defendants automatically deduct thirty minutes from each shift worked by their employees, regardless of whether the employee actually took a meal break during that shift. (*See* Doc. 112 at 5.) While Defendants' written policy does provide that "[e]mployees who are unable to take an uninterrupted lunch break due to work load will be paid for that time," (*see* Doc. 112-1 at ¶ 1.2.1.1), Plaintiffs assert that the written policy is not followed. (*See* Doc. 112 at 5.)

To support their substantive claims, the named Plaintiffs, all of whom worked as nurses for Defendants at various times between 2004 and 2015, submitted affidavits. (*Id.* at 6.) Plaintiffs averred in their affidavits that: (1) Defendants had a policy of automatically deducting thirty minutes from each shift for a meal break regardless of whether an employee actually took a meal break; (2) this automatic deduction policy applied to all employees responsible for direct patient care at Memorial Health System; (3) they could not recall a single time during the last three years that they were able to take a full thirty-minute meal break; (4) they were never scheduled for a thirty-minute, uninterrupted meal break; (5) they were reprimanded when they attempted to cancel automatic lunch deductions in the electronic timekeeping system due to a missed meal break; (6) they were discouraged from leaving the floor during their meal breaks; and (7) managers were aware that nurses were working through their meal breaks, but did not ensure that nurses were completely relieved of their duties during uncompensated meal breaks. (*See* Docs. 112-2, 112-3, 112-4 ¶¶ 2–12.)

Deposition testimony from the named Plaintiffs corroborated the statements in their affidavits, and also provided that: (1) Defendants had a "standing policy" of not permitting employees to take meal breaks, cancel the automatic meal break deduction in the electronic timekeeping system, or clock out for the day with a notation that the employee had not taken a

meal break[2]; (2) employees received inadequate training on the electronic timekeeping system, and were never specifically trained on how to cancel the automatic meal break deduction or clock out no lunch; (3) when employees clocked out no lunch, the automatic meal break deduction was never actually cancelled and thus the employees were never paid for those missed meal breaks; and (4) Defendants never provided employees proof of their hours worked. (*See id.* at 7–12, 13–14.) Opt-in plaintiffs Stacy Hanlon, Kim Weckbacher, Josh Booth, and Mary Clegg testified similarly at their depositions. (*See id.* at 12–13, 14–18.) Weckbacher and Clegg also testified that they were not paid for overtime worked. (*See id.* at 16, 18.)

The issue currently before the Court is Defendants' alleged "unilateral ex-parte communications" with potential class members. (*See id.* at 27.) According to Plaintiffs, Defendants have "coerced, intimidated, and harassed" potential class members, creating an "atmosphere of fear" such that they are afraid to join the lawsuit. (*Id.*) As examples of actions taken by Defendants to create this "atmosphere of fear," Plaintiffs cite:

- Alleged retaliation against named Plaintiffs Lynnett Myers and Carol Butler. After Myers and Butler left their jobs with Defendants, the hospital allegedly contacted their new employer, Jackson Nursing, and stated that it could not hire Myers and Butler. (*See id.*) Jackson Nursing then revoked Myers' and Butler's offers of employment. (*Id.*)

- The hospital's alleged revocation of a "flex time job" offer to opt-in plaintiff Josh Booth after he joined the lawsuit. (*Id.* at 28.) Booth also testified that he lost his health insurance after joining the lawsuit. (*See id.*)

- Defendants' holding of "huddle meetings" in the mornings before shifts to announce which employees have been fired from the hospital. (*See id.*)

- Meetings with individuals named during Weckbacher's deposition. (*See id.*) After Defendants deposed Weckbacher, they allegedly sought out three specific individuals Weckbacher referenced in her deposition, met with them, and asked them to complete a questionnaire that "specifically named Ms. Weckbacher and indicated that Ms. Weckbacher discussed them in deposition." (*Id.*)

---

[2] In their motion, Plaintiffs refer to this as "clock out no lunch." (*See, e.g.*, Doc. 112 at 9.)

3

Plaintiffs' witnesses corroborated this information in their testimony at the Preliminary Injunction hearing. Booth testified that he was called down to Human Resources to discuss the wage and hour lawsuit, and that he felt intimidated and "backed into a corner" when he was asked by Defendants' counsel to sign a pre-drafted affidavit stating that the hospital's lunch policy was clear and concise, and he testified to having conversations with many employees who were afraid to join the lawsuit. (*See* Draft Transcript of Mar. 30, 2017 Preliminary Injunction Hearing (hereinafter "Hr'g Tr.") at 55–59, 62.) Booth also testified that the "culture of fear" created by Defendants caused him to feel like there was "always someone watching over [his] shoulder" at work, and he ultimately was diagnosed with depression and anxiety. (*See id.* at 60.) Mary Goode, a nurse at the hospital for over thirty years, testified that she was concerned about losing her job if she joined the lawsuit, and that she was uncomfortable after she left a meeting with Human Resources in February 2017. (*See* Hr'g Tr. Vol. II at 2–3, 11–13.) During that meeting, Goode was asked to give out the names of other employees involved in a conversation about the lawsuit with Weckbacher, but refused because those employees were concerned about participating in the lawsuit and the loss of their jobs. (*See id.* at 17–18.) Finally, Weckbacher testified that people discussed how they would be "fool[s]" to think their jobs would not be affected by joining the lawsuit, and stated that she thought it was intimidating for the hospital to identify her by name in the questionnaires used to interview employees about potential harassment and retaliation. (*See* Hr'g Tr. at 86–87, 96–97.)

Defendants dispute Plaintiffs' characterization of their communications with their employees—specifically the meetings with the individuals identified by Weckbacher at her deposition. In addition to being an opt-in plaintiff in this collective action, Weckbacher has filed

an individual retaliation lawsuit against Defendants.[3] (Doc. 111 at 2.) During Weckbacher's deposition, she testified about three individuals who were present during a purported conversation about the wage and hour lawsuit, and who "had expressed concerns of potential retaliation" by the hospital. (*Id.*)

Dan Weaver, Director of Human Resources for Memorial Health System, met with the three individuals named by Ms. Weckbacher to interview them "regarding Ms. Weckbacher's claims that they had information concerning harassment and retaliation or workplace fear." (*Id.* at 3.) The three employees Weaver interviewed were each provided notice of the wage and hour lawsuit, did not opt in, and are current hospital employees. (*See id.*) Defendants assert that "Mr. Weaver's interviews were specifically limited to persons who had not consented to join the collective action and could not join that action since the opt-in period had expired. Accordingly, those persons were not parties, were not represented by counsel, and were subject to a legitimate investigation" by Weaver to "ensure that the workplace is free of retaliation and harassment." (*Id.*)

These interviews were conducted in the presence of employee relations specialists, and without counsel present. (*See id.*) At the beginning of each interview, Weaver "orally assur[ed]" each employee that he or she "would not suffer any adverse action, retaliation, or disciplinary action as a result of participation in the interview or lawsuit." (*Id.*) Weaver reaffirmed this in writing. (*See id.*) After the employees agreed to participate in the interviews, Weaver provided them with a questionnaire. (*See id.* at 4.) Some of the questions referred to retaliation, while others pertained to Defendants' meal break policy. (*Id.* at 4.) The questionnaire also specifically referenced Weckbacher. (*See id.*)

---

[3] *See Weckbacher v. Mem'l Health Sys., et al.*, Case No. 2:16-cv-01187.

Aside from the three aforementioned employees, Weaver has not communicated with any employee who received notice of the collective action. (*See id.* at 5.) Indeed, Defendants maintain that Weaver was unaware of the identities of the employees who opted in to this lawsuit "[u]ntil recently," and that he conducted interviews with the three employees named by Weckbacher in his capacity as Human Resources Director, to ensure that he did his duty to preserve a harassment- and retaliation-free workplace. (*See id.* at 3, 5.) Defendants also claim that Weaver was "properly assisting his counsel in the investigation of the facts surrounding the collective action allegations." (*Id.* at 3.)

### B. Procedural Background

Plaintiffs filed this putative collective and class action lawsuit in October 2015, alleging violations of the FLSA and MFWSA. (*See* Doc. 1.) Plaintiffs amended their complaint in May 2016, bringing two additional Ohio law claims: a purported violation of Ohio's Prompt Pay Act and a common law unjust enrichment claim. (*See* Doc. 33.) This Court conditionally certified an FLSA class in August 2016. (*See* Doc. 42.) Several months later, Plaintiffs filed a motion for class certification under Federal Rule of Civil Procedure 23 for their state law claims. (Doc. 74.) Defendants' opposition to Plaintiffs' motion for class certification is due on April 18, 2017. (*See* Doc. 101.)

On March 1, 2017, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO"). (Doc. 97.) Several days later, the Court held a hearing on Plaintiffs' Motion for a TRO and issued a TRO on the same day, temporarily enjoining and restraining "Defendants, and all those acting in concert with them . . . from communicating with putative class members" about this lawsuit. (*See* Doc. 101.) The TRO, which remained in effect until the Preliminary Injunction hearing, did not prohibit Defendants from communicating with their employees about "issues

6

that arise within the scope of employment, the treatment of patients or any other matter that relates to the performance of their jobs." (*Id.*) Defendants' counsel drafted the language of the TRO; Plaintiffs' counsel agreed to the language and made no revisions before the parties submitted the proposed TRO to the Court. (*See* Doc. 115 at 2.)

In their Motion for a Preliminary Injunction, Plaintiffs request the following relief: (1) an order enjoining Defendants from engaging in further unilateral communications about this lawsuit with potential class members; (2) a re-opening of the opt-in period for the entire class of 1,954 individuals; (3) issuance of corrective notice to the collective class members who have already received notice; (4) the addition of language to the notice form being sent to collective class members who have not yet joined the suit, which states that the Court is aware of Defendants' coercive tactics and efforts to discourage participation in the lawsuit; (5) an order requiring Defendants to bear the costs associated with sending corrective notice; and (6) an award of attorneys' fees and costs associated with compelling Defendants to provide a complete class list, the TRO, and the preliminary injunction. (*See* Doc. 112 at 35.)

## II. LAW AND ANALYSIS

### A. Standard of Review

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In light of its "limited purpose," a preliminary injunction is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Accordingly, a party need not prove her case in full at a preliminary injunction hearing. *Id.*

When considering a motion for preliminary injunction, a district court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). These four considerations are "factors to be balanced, not prerequisites that must be met." *Certified Restoration*, 511 F.3d at 542. Whether the combination of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court. *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### B. Likelihood of Success on the Merits

Plaintiffs and Defendants disagree about which claims they must prove meritorious: the Plaintiffs' underlying wage and hour claims, or "whether Plaintiffs can establish sufficient harm to limit Defendants' unilateral communications with putative class members"—the issue currently before the Court. (*See* Doc. 115 at 3.) Ultimately, this is a non-issue, as the Court finds that, at this stage of the litigation, Plaintiffs have established a likelihood of success on the merits on their substantive claims (*see* Doc. 112 at 19–26) *and* have established sufficient harm to limit Defendants' unilateral communications with putative class members. Thus, the first factor weighs in favor of granting Plaintiffs' Motion. Accordingly, the Court will focus on the issue presently before it: Defendants' unilateral communications with putative class members.

Prior restraints on a party's speech are generally disfavored under the First Amendment. *See Near v. Minnesota*, 283 U.S. 697 (1931). A court may not restrict communications between parties and potential class members unless the restriction is "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the

rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101–02 (1981). Any order restricting a party's speech must be "carefully drawn" and "limit[] speech as little as possible." *Id.* at 102. A court may not impose "serious restraints on expression" without being mindful of "whether the restraint is justified by a likelihood of serious abuses." *Id*. at 104. "'In general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a heightened sensitivity for first amendment concerns.'" *Friedman v. Intervet Inc*., 730 F. Supp. 2d 758, 762 (N.D. Ohio 2010) (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1205 (11th Cir. 1985)).

Defendants argue that Plaintiffs have provided no evidence that the three interviews conducted by Weaver were "misleading, coercive, or an attempt to undermine the collective action," *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003), and therefore limiting Defendants' speech is unwarranted. (*See* Doc. 111 at 8.) Also, Defendants claim that the vague, "conclusory" terms used by Plaintiffs like "atmosphere of fear" do not constitute the "clear record" of abuse necessary to limit constitutionally protected speech. (*See id.*)

However, as detailed above, in addition to the documentary evidence and deposition testimony presented by Plaintiffs, the testimony at the Preliminary Injunction hearing established a clear record of a likelihood of serious abuses by Defendants. *See Gulf Oil*, 452 U.S. at 101–02, 104. Multiple witnesses testified to feeling intimidated and singled out by Human Resources when questioned about the lawsuit or the Defendants' lunch break policy. All of the witnesses testified that they knew of and spoke with employees who were afraid to join the lawsuit. One witness was even diagnosed with clinical depression and anxiety as a result of the work environment at the hospital.

In light of this record, the Court finds that there is good cause for limiting communications with putative class members, *see Friedman*, 730 F. Supp. 2d at 762, and therefore the first factor weighs in favor of granting Plaintiffs' Motion for a Preliminary Injunction.

### C. Irreparable Harm

The evidence discussed above also establishes irreparable harm, because if potential class members are intimidated and afraid to join the lawsuit, they cannot vindicate their rights under the FLSA and Ohio law. This evidence is bolstered by the "opt-in figures" in this case: only twenty-five current employees have opted in to this collective action of a total of 1,168 notices that have been sent to collective class members, and of those twenty-five opt-ins, only twenty remain employed by Defendants. (*See* Doc. 112 at 29.) Further, as Plaintiffs correctly point out, the potential for coercion and irreparable harm is more likely when the class opponent and the class members are in an "ongoing business relationship." *Kleiner*, 751 F.2d at 1202. This concern is heightened here, where, because Defendants are the largest employer in the county, class members are especially "vulnerable" and "reliant on the business relationship with the Defendants." (*See* Doc. 115 at 6.)

Defendants argue that "Plaintiffs have not even sustained an injury, let alone an irreparable injury," as the "'threat' complained of are interviews that occurred on February 15 and 17, 2017, two months after the opt-in period closed." (Doc. 111 at 11.) Plaintiffs note, however, that these types of communications could have a "chilling effect" in light of the fact that Defendants did not provide a complete class list and approximately 792 putative class members have not received opt-in notice to date. (*See* Doc. 112 at 32.)

The Court recognizes that it is difficult to envision how potential class members have suffered irreparable harm by Defendants interviewing two non-opt-in employees *after* the opt-in period had closed. (*See* Doc. 111 at 11.) However, Defendants take an overly narrow view of the harm alleged; Plaintiffs are not focused solely on three February 2017 employee interviews. The broader evidence offered by Plaintiffs of the "atmosphere of fear" at the hospital and the Defendants' position of power in the business relationship weighs in favor of granting a preliminary injunction.

### D. Substantial Harm to Others

Plaintiffs argue that the grant of a preliminary injunction will not substantially harm Defendants, as they do not have an "absolute right to unilaterally investigate the claims in this case"; any information to aid in the preparation of their defense can be gained through the formal discovery process. (*See* Doc. 115 at 7–8.) And indeed, Defendants should not *need* to conduct any further investigation of the class claims, given that the deadline for conducting discovery related to class certification is now closed. (*See* Doc. 91 (setting a March 1, 2017 cut-off for class-related discovery).) Moreover, Plaintiffs note that they are not seeking to enjoin Defendants from engaging in *all* investigations, only those outlined in the narrowly tailored language of the TRO, which Defendants drafted. (*See* Doc. 115 at 8.) Finally, Plaintiffs note that they are not seeking a *permanent* injunction, simply an injunction to "preserve putative class members' rights pending a decision on class certification." (*See id.* at 6.)

In rebuttal, Defendants argue that an injunction would substantially harm the hospital's ability to conduct business and to defend this lawsuit. (*See* Doc. 111 at 11–12.) Specifically, Defendants focus on Weaver's inability to "ensure a workplace free of harassment and threats"

as Human Resources Director.  More persuasive is Defendants' argument that restricting their communications with employees implicates their First Amendment rights.  (*See id.* at 6–10.)  In so arguing, Defendants rely heavily on this Court's decision denying the plaintiffs' emergency motion for a protective order in an FLSA case: *Lewis v. Huntington National Bank*, No. C2-11-CV-0058, 2011 WL 8964496 (S.D. Ohio Oct. 24, 2011).  In *Lewis*, the Court declined to institute a ban on communications between counsel and potential class members where plaintiffs provided the sworn declarations of two opt-in FLSA plaintiffs averring that they were subjected to "meritless investigations" and "coercive" back pay practices, finding that plaintiffs had not met their burden to prove "severe abuses."  *See Lewis*, 2011 WL 543016, at *1–3, *6.

But *Lewis* is distinguishable.  First, the amount of evidence of intimidation before the Court in this case far exceeds the two declarations provided by the employees in *Lewis*.  In addition, here, Defendants specifically referenced Weckbacher, an employee who had recently been terminated, in interview questionnaires, which may have intimidated the employees subject to the interviews, and discouraged them from opting in to the lawsuit.  Further, the fact that Defendants are the county's largest employer makes it more likely for employees to be aware of what is occurring or what other employees are facing and become intimidated, and makes potential class members particularly vulnerable in light of their reliance on the business relationship with Defendants.

Finally, given that the class discovery period is over, Defendants should not suffer harm from a continued injunction until the Court rules on class certification.  Defendants can continue to investigate their claims through formal discovery after a decision on class certification.

For these reasons, Defendants will not suffer substantial harm if the Court grants Plaintiffs a preliminary injunction.

### E. Public Interest

Plaintiffs argue that this factor "heavily" favors them, as the "FLSA was enacted for the purpose of protecting workers from substandard wages and oppressive working hours," and the vindication of FLSA rights is always in the public interest, particularly in light of the inequality in bargaining power between employers and employees. (*See* Doc. 112 at 34.)

Defendants assert that this factor weighs against granting an injunction, as the "collective action mechanism, as set forth by statute, allowed the Plaintiffs and putative class members to opt-in," and no additional protection is necessary. (*See* Doc. 111 at 12.)

Protecting both FLSA rights *and* free speech is in the public interest. By granting an injunction, the Court can protect both parties by only narrowly infringing on Defendants' speech rights, while still ensuring that class members have the opportunity to opt in to the lawsuit. Accordingly, this final factor favors Plaintiffs.

### III. CONCLUSION

For the reasons set forth above, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion for a Preliminary Injunction.

The Court will keep in place the narrowly tailored TRO it issued on March 3, 2017, enjoining and restraining Defendants and all those acting in concert with them, including but not limited to the directors, officers, and supervisors of employees of Defendants, from communicating directly or indirectly with putative class members about this lawsuit. Defendants are *not* prohibited from communicating with their employees about issues that arise within the scope of employment, the treatment of patients or any other matter that relates to the performance of their jobs. The injunction will remain in place until the Court rules on Plaintiffs' Rule 23 class certification motion.

Defendants should not be negatively impacted by keeping the original injunction in place. Because class discovery is closed, Defendants should have no need to discuss the wage and hour lawsuit with their employees, and they are not prohibited from investigating the claims in Weckbacher's individual retaliation lawsuit under the terms of the injunction.

The Court will reopen the opt-in period for the entire class of 1,954 individuals through **May 1, 2017**. Plaintiffs may re-send the notice previously approved by the Court to the entire class, at their own expense. The Court declines to issue corrective notice, or award the attorneys' fees and costs requested by Plaintiff.

**IT IS SO ORDERED.**


                                                       s/Algenon L. Marbley
                                                     **ALGENON L. MARBLEY**
                                                     **UNITED STATES DISTRICT JUDGE**


**DATED: April 20, 2017**