**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Lynnett Myers, et al., | : | |
| | : | Case No. 2:15-cv-2956 |
| Plaintiffs, | : | |
| v. | : | Judge Algenon L. Marbley |
| | : | |
| Memorial Health System | : | Magistrate Judge Chelsey M. Vascura |
| Marietta Memorial Hospital, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MOTION TO DECERTIFY**
**THE FLSA COLLECTIVE AND RULE 23 CLASS**

Defendants Marietta Health Care, Inc. dba Memorial Health System and Marietta Memorial Hospital, Selby General Hospital, J. Scott Cantley, and Eric Young (collectively, "Marietta") hereby move to decertify both the Fair Labor Standards Act ("FLSA") Collective and the Rule 23 Class. A Memorandum in Support is attached hereto. This Motion is further supported by the declaration, report, and rebuttal report of statistical expert Jonathan Walker, Ph.D., the declaration of Dan Weaver, as well as the deposition transcripts and other sources cited herein.

Respectfully submitted,

/s/ *James Davidson*
James E. Davidson (0024534) (Trial Attorney)
Email: James.Davidson@icemiller.com
Catherine L. Strauss (0072980)
Email: Catherine.Strauss@icemiller.com
Abigail J. Barr (0092679)
Email: Abigail.Barr@icemiller.com
Lydia F. Reback (0097766)
Email: Lydia.Reback@icemiller.com
ICE MILLER LLP
250 West Street, Suite 700
Columbus, OH 43215
(614) 462-2700
Fax: (614) 462-5135

*Attorneys for Defendants*

## TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................................................. 1

II.  STATEMENT OF FACTS ............................................................................................................ 2

   A.   MARIETTA'S LUNCH DEDUCTION POLICY IS CLEAR, LAWFUL, AND PLAINTIFFS
   CONSISTENTLY CANCELED THEIR LUNCH DEDUCTIONS WHEN THEY COULD NOT TAKE AN
   UNINTERRUPTED LUNCH BREAK. ..................................................................................................... 2

   B.   THE EVIDENCE ADDUCED IN DISCOVERY DEMONSTRATES THAT INDIVIDUAL DIFFERENCES
   CLEARLY PREDOMINATE OVER COLLECTIVE ISSUES. ....................................................................... 4

      1.   FEW EMPLOYEES OPTED-IN TO THE LAWSUIT. ............................................................... 4

      2.   THE PLAINTIFFS WHO PARTICIPATED IN DISCOVERY GAVE CONFLICTING TESTIMONY. . 5

      3.   PLAINTIFFS' EXPERT PROVIDED NO RELIABLE MEASURE BY WHICH TO CALCULATE
      CLASS-WIDE DAMAGES. ............................................................................................................... 7

   C.   PLAINTIFFS PROVIDED A LENGTHY WITNESS LIST BUT HAVE REFUSED TO PRODUCE A
   TRIAL PLAN. ................................................................................................................................. 8

III. THE COURT SHOULD DECERTIFY THE FLSA COLLECTIVE ............................................. 9

   A.   STANDARD OF REVIEW. ................................................................................................. 9
   B.   MARIETTA'S LUNCH DEDUCTION POLICY COMPLIES WITH THE FLSA ............................. 10
   C.   THE OPT-IN PLAINTIFFS ARE NOT SIMILARLY SITUATED TO THE COLLECTIVE, THUS THE
   COURT SHOULD DECERTIFY THE COLLECTIVE. ............................................................................ 11

      1.   WHETHER ANY PLAINTIFF SUFFERED A COMPENSABLE FLSA INJURY DEPENDS ON
      NUMEROUS UNIQUE EMPLOYMENT CIRCUMSTANCES, NECESSITATING DECERTIFICATION OF
      THE COLLECTIVE. ...................................................................................................................... 12

      2.   MARIETTA WILL NEED TO PRESENT INDIVIDUALIZED DEFENSES IN RESPONSE TO THE
      OPT-IN PLAINTIFFS' INDIVIDUALIZED ALLEGATIONS. ................................................................ 19

      3.   FAIRNESS AND PROCEDURAL CONSIDERATIONS WEIGH IN FAVOR OF DECERTIFYING
      THE COLLECTIVE. ...................................................................................................................... 21

IV.  THE COURT SHOULD DECERTIFY THE RULE 23 CLASS ................................................. 22

   A.   STANDARD OF REVIEW. ................................................................................................. 22
   B.   PLAINTIFFS CAN SATISFY NEITHER THE COMMONALITY NOR TYPICALITY REQUIREMENTS
   OF RULE 23(A). ............................................................................................................................ 23

      1.   PLAINTIFFS' CLAIMS LACK SUFFICIENT COMMONALITY IN VIOLATION OF RULE
      23(A)(2). .................................................................................................................................... 23

      2.   PLAINTIFFS SIMILARLY CANNOT SATISFY RULE 23(A)(3)'S TYPICALITY REQUIREMENT.
      29

C.  QUESTIONS OF LAW OR FACT UNIQUE TO THE INDIVIDUAL CLASS MEMBERS
PREDOMINATE OVER QUESTIONS COMMON TO THE CLASS IN VIOLATION OF RULE 23(B)(3).. 33

V.  CONCLUSION.................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)....................................................22, 33

*Blaney v. Charlotte–Mecklenburg Hosp. Auth.,*
  2011 WL 4351631 (W.D.N.C. 2011) .......................................................................................14

*Camesi v. University of Pittsburgh Medical Center,*
  2011 WL 6372873 (W.D. Penn. 2011) ................................................................12, 13, 19, 21

*Coleman v. Gen. Motors Acceptance Corp.,*
  296 F.3d 443 (6th Cir. 2002) ...................................................................................................22

*Comer v. Wal-Mart Stores, Inc.,*
  454 F.3d 544 (6th Cir. 2006) ...............................................................................................9, 10

*Creely v. HCR ManorCare, Inc.,*
  920 F. Supp. 2d 846 (N.D. Ohio 2013)......................................................................... *passim*

*Davis v. Cintas Corp.,*
  717 F.3d 476 (6th Cir. 2013) ...................................................................................................23

*Douglas v. First Student, Inc.,*
  888 F. Supp. 2d 929 (E.D. Ark. 2012)....................................................................................14

*Espenscheid v. DirectSat USA, LLC,*
  2011 WL 2009967 (W.D. WI, May 23, 2011), *aff'd,* 705 F. 3d 770 (7th Cir.
  2013) ........................................................................................................................................34

*Frye v. Baptist Mem'l Hosp., Inc.,*
  495 Fed. App'x. 669 (6th Cir. 2012) ..................................................................................11, 12

*Hendricks v. Total Quality Logistics, LLC,*
  No. 1:10-cv-649, 2019 WL 2387206 (S.D. Ohio Mar. 22, 2019) ...........................................33

*Hill v. United States,*
  751 F.2d 810 (6th Cir. 1984) ...................................................................................................10

*Hoffmann–La Roche, Inc. v. Sperling,*
  493 U.S. 165, 110 S. Ct. 482 (1989).........................................................................................9

*Johnson v. Big Lots Stores, Inc.,*
  561 F. Supp. 2d 567 (E.D. La. 2008)...........................................................................14, 19, 21

*Johnson v. TGF Precision Haircutters, Inc.*,
  No. CIV.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. 2005) ..........................................14, 21

*Jones-Turner v. Yellow Enteprise Sys., LLC*,
  597 F. App'x 293 (6th Cir. 2015) .....................................................................................10, 11

*Kuznyetsov v. West Penn Allegheny Health System, Inc.*,
  2011 WL 6372852 (W.D. Penn. 2011) ..............................................................................13, 21

*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) ...................................19

*Monroe v. FTS USA, LLC*,
  763 F. Supp. 2d 979 (W.D. Tenn. 2011) ...........................................................................10, 11

*O'Brien v. Ed Donnelly Enters., Inc.*,
  575 F.3d 567 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald
  Co. v. Gomez*, 136 S. Ct. 663 (2016) ........................................................................................11

*Roussell v. Brinker Int'l, Inc.*,
  CIV.A. H–05–3733, 2008 WL 2714079 (S.D. Tex. 2008) ................................................14, 18

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ............................................................................................29, 30

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ............................................................................................33, 34

*Valentino v. Carter-Wallace, Inc.*,
  97 F. 3d 1227 (9th Cir. 1996) ...................................................................................................34

*Waggoner v. U.S. Bancorp*,
  110 F. Supp. 3d 759 (N.D. Ohio 2015) .......................................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338, S.Ct. 2541 (2011) ...............................................................................23, 27, 33

*White v. 14051 Manchester Inc.*,
  301 F.R.D. 368 (E.D. Mo. 2014) ......................................................................................18, 19

*White v. Baptist Mem'l Health Care Corp.*,
  2011 WL 1883959 (W.D. Tenn. 2010), *aff'd* 699 F.3d 869 (6th Cir. 2012) ....................10, 13

*Whitlock v. FSL Mgmt., LLC*,
  843 F.3d 1084 (6th Cir. 2016) ...................................................................................................22

*Young v. Nationwide Mutual Insurance Co.*,
  693 F.3d 532 (6th Cir. 2012) ...................................................................................................33

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011) .......................................................................21

**Other Authorities**

Federal Rule of Civil Procedure 23(a) ......................................................................22

Federal Rule of Civil Procedure 23(a)(2) .................................................................23

Federal Rule of Civil Procedure 23(b)(3) .................................................................33

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84
    N.Y.U. L. REV. 97 (2009) .....................................................................................23

<u>**MEMORANDUM IN SUPPORT**</u>

**I.**     <u>**INTRODUCTION AND SUMMARY OF THE ARGUMENT**</u>

In a class or collective action, the individual plaintiffs' claims should be akin to bricks, which when joined together form a solid wall. Each brick should resemble every other brick, and regardless of which bricks rest on the foundation versus the top of the wall, every brick should be interchangeable and capable of serving the same function as any other brick. Here, instead of presenting the Court with a brick wall comprised of interchangeable components, Plaintiffs more closely resemble thousands of puzzle pieces, each with its own contours. Some (but not all) are the same color, some are large while others are small. Unlike the homogeneous bricks, examining one puzzle piece reveals little (if anything) about any other puzzle piece. Even if the Court attempts to assemble these incompatible pieces, the resulting picture will be nothing more than a jumbled mess, reflecting only the individual components rather than a cohesive, unified image. When plaintiffs attempt to force together thousands of disparate claims, class and collective action treatment is not appropriate. This case presents just such a situation.

When the Court initially considered whether to certify the FLSA Collective and the Rule 23 Class, the extent of these differences were not apparent. Now, several years later and with the benefit of 63 interrogatory responses and twenty-two (22) deposition transcripts, the record establishes that the individual plaintiffs' claims are not interchangeable for one another. Though Plaintiffs appear to allege that Marietta implemented an informal "policy to violate the policy," numerous Plaintiffs agree that no such policy existed, whether covert or otherwise. Given the Plaintiffs' widely varying employment circumstances and the competing legal theories at play, the Court should decertify both the FLSA Collective and the Rule 23 Class.

## II.    STATEMENT OF FACTS[1]

This case is a hybrid action involving collective action claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and class claims under Federal Rule of Civil Procedure 23 and the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111, *et seq.* (the "Ohio Act"). Three named plaintiffs – Lynnett Myers, Arva Lowther, and Carol Butler (collectively, the "Named Plaintiffs") – purport to represent several thousand "direct patient care" providers on behalf of both the FLSA Collective and the Rule 23 Class. The following summarizes the procedural history relevant to this Motion.

### A.    Marietta's Lunch Deduction Policy Is Clear, Lawful, And Plaintiffs Consistently Canceled Their Lunch Deductions When They Could Not Take An Uninterrupted Lunch Break.

Memorial Health System operates Marietta Memorial Hospital ("Marietta"). Memorial Health System also operates Selby General Hospital, Belpre Emergency Department, and numerous outpatient-related centers providing various services. Marietta has a straightforward, lawful lunch deduction policy and trained its employees regarding the policy. This training is effective as the record demonstrates that an overwhelming number of Plaintiffs consistently cancelled the lunch deduction when their lunch breaks were interrupted.

Marietta has straightforward policies relating to meal breaks and deductions of pay relating to breaks. The published policy plainly states that employees are entitled to a 30-minute lunch break. This policy is explained in Marietta's Personnel Policy No. 80:05 relating to Hours of Work at 3.1.5: "[l]ike all employees working more than a 4 hour shift, a 30 minute lunch is automatically assumed to be part of all employee's shifts." There are a few exceptions for patient care employees

---

[1] The factual background described herein regarding Marietta's policies and practices is supported by the March 2016 Declaration of Dan Weaver, filed as an attachment to Marietta's Response in Opposition to Plaintiffs' Motion for Conditional Certification. (ECF No. 17-1).

2

in the emergency department. Due to the nature of emergency care, those individuals are not scheduled for automatic thirty-minute deductions.

Marietta's policy is to pay employees for their lunch break when they are unable to take an uninterrupted lunch break due to their workload. Marietta published this rule in Personnel Policy No. 40:01 relating to Overtime and Work Scheduling. The provision states: "1.2.1.1 Employees who are unable to take an uninterrupted lunch break due to work load will be paid for that time." Marietta provides clear guidance on how employees should be compensated for interrupted breaks. Specifically, Policy No. 80:05 explains:

5.0     Lunch – Lunch Periods

5.1     Scheduling of lunch periods is the responsibility of the Manager. A normal lunch period is 30 minutes.

5.2     The cafeteria is provided for employees to bring their lunch, as well as those who purchase it.

5.3     Employees are not permitted to eat in patient or public areas of the hospital.

5.4     Employees are not permitted to work their lunch period without permission of their Department Manager or Supervisor.

    5.4.1 Employees who are unable to take an interrupted lunch break due to work load will be instructed to cancel their lunch deduction by their supervisor or may be released for work 30 minutes early.

5.5     Employees leaving the building during lunch must time stamp out, time stamp back in when returning and call MyMemorial Absence Line at 1-855-306-8837.

In addition, as a convenience to the employees, self-reporting of interrupted lunch breaks through the Kronos timekeeping system is required. Upon clocking out, each employee may self-select "Cancel all meal deductions." Once the employee cancels the deduction, she is then paid for the missed or interrupted lunch break. Marietta also provides clear guidance to managers on how to complete the payroll process once an employee has notified them of an interrupted break. As

3

set forth in Policy 7.1.26, managers should use an earning code, titled NO LUNCH, which provides:

> 7.1.26 No Lunch – Applies to scheduled shifts (of at least 5.5 hours) in which the employee was unable to take a lunch break. Employees must notify their Manager for approval. At the option of the Manager, the work day can be shortened in order to avoid the additional paid time.

All employees receive these policies as part of orientation training. These policies are available at any time on Marietta's intranet, which is accessible to all employees.

Not all Marietta employees provide direct care for patients. The direct care employees include registered nurses, patient care technicians, care coordinators, emergency department technicians, licensed practical nurses and medical assistants. Depending upon function and definition, Marietta employs anywhere from several hundred to more than a 1,000 people in these positions.

Marietta pays patient care providers for all of their time worked. Indeed, many Plaintiffs stated in their discovery responses and deposition testimony that they were paid for all hours worked, and Marietta has filed numerous declarations from other employees who corroborate this testimony.

**B.    The Evidence Adduced In Discovery Demonstrates That Individual Differences Clearly Predominate Over Collective Issues.**

The evidence adduced in discovery demonstrates that the Named Plaintiffs are not similarly situated to the Opt-In Plaintiffs, and that individual differences clearly predominate over collective issues, requiring decertification of both the Opt-In Collective and Rule 23 Class.

**1.    Few Employees Opted-In To The Lawsuit.**

The miniscule rate of participation in the Collective indicates that no common policy violates the FLSA. Of the several thousand individuals notified after conditional certification, only 147 opted-in to this lawsuit, undermining the Named Plaintiffs' allegations and suggesting that

4

their grievances against Marietta are not widely shared by the many patient care providers who received notice of this litigation.

### 2. The Plaintiffs Who Participated In Discovery Gave Conflicting Testimony.

Plaintiffs allege that they are entitled to overtime compensation for unspecified weeks where they experienced a missed or interrupted meal break for which they were not compensated (collectively referred to as a "Meal Break Event"). As in other healthcare meal break cases, discovery revealed substantial variation among the Plaintiffs' respective allegations, each of which are highly individualized. The approximately 2,500 Plaintiffs had 266 different job titles, worked in three different facilities, different departments and on various shifts, reported to different supervisors, and provided care to different patient populations.

Significantly, Plaintiffs offered a variety of explanations for why they canceled the lunch deduction (or chose not to do so). Approximately 60% of the Plaintiffs who responded to Marietta's interrogatories and/or participated in a deposition (collectively, the "Discovery Sample") stated that they were aware that they could cancel the lunch deduction during some or all of their employment. (Expert Report of Dr. Jonathan Walker ("Walker Rpt.") at ¶ 51) (attached hereto as **Exhibit 1**). For example, Plaintiffs Jaret McCutcheon and Elizabeth Creeger both testified that they were aware of the option to cancel the lunch deduction and neither's supervisor ever directed them not to do so. (McCutcheon Dep. at 7:2-8:10; Creeger Dep. at 7:19-9:16) (the deposition excerpts cited herein are filed herewith as **Exhibit 2**). By comparison, Opt-In Plaintiff Kim Weckbacher explained that she was not always aware of the option to cancel her lunch deduction if she was unable to take an uninterrupted, 30-minute lunch break, and even once she became aware of the option to cancel, she didn't always do so for reasons unrelated to her supervisor:

5

> [F]or a long time, I didn't know it was an option.  Then once I
> became aware of it, in the beginning -- we actually had a time clock
> that was out in the lobby, not on our unit.  And once you swipe your
> badge to clock out, you lose the ability to [cancel the deduction]. So
> you had to have it in the forefront of your mind and remember to do
> that on your way out the door. And sometimes I was just ready to
> get out of there and swipe the badge in trying to make the line move
> quickly and would forget to do it. Other times later on that time
> clock was removed and we used a computer, various computers on
> our unit that we would have to log in and out on.  And it was always
> an issue finding an empty computer that wasn't being used.

(Weckbacher Dep. at 15:15-16:5).

Other Plaintiffs testified differently, and claimed either to have no knowledge of the option

to cancel the lunch deduction, claimed there was no component of the timekeeping system that

allowed them to cancel the deduction, and/or admitted to making day-to-day judgment calls about

whether to cancel the lunch deduction, for example:

- Elizabeth Gordon testified that no supervisor ever discouraged her from canceling the lunch deduction, and that she "was not aware that [she] could clock out no lunch." (Gordon Dep. at 9:15-18).

- "[T]he only time that – that I haven't had a lunch and didn't clock out is if I only got called out for one call light, you know, one call light went off and I answered it, I didn't count that against, you know, not having a lunch. Q:  You chose not to cancel the lunch deduction? A:  Right." (King Dep. at 7:1-7).

- "Q:  So it's fair to say either under the new [timekeeping] system or the old system, that no one ever told you that you were not permitted to override the automatic deduct? A: Yeah, no. Q:  No one ever said that? A: That we were not permitted? No. Q:  Right. And you understood that that functionality was there; correct? A:  Yes.  I just ---.  Yes, I just didn't know how to use it." (Clegg Smith Dep. at 46:18-47:2).

- "The only thing that I did with my time-- time sheet was get on there to clock in and to clock out.  And if I didn't get a lunch, I would have to – I was told to email the lady that took care of the time clock or time sheets and our supervisor to let them know that we didn't get the lunch. . . . There may have been [an option to cancel the lunch deduction], but I was told not to do anything. I had to email the lady that took care of the time sheets and our supervisor." (Martin Dep. at 13:5-17).

Furthermore, numerous Discovery Sample Plaintiffs stated that their cancellation experiences differed according to the department and/or job that in which they worked. (*See* Walker Rpt. at ¶¶ 62-72).

Though all three Named Plaintiffs stated that their supervisor directed them not to cancel the lunch deduction, approximately 75% of plaintiffs who participated in discovery said that they never experienced such direction from a supervisor, or that they could not recall anything like that ever taking place. (Walker Rpt. at ¶ 53).

Still others presented different theories of the case, further confounding the variables the Court should consider in adjudicating Plaintiffs' claims. (*See, e.g.* Miller Dep. 31:7-17; Kegley Dep. 31:19-32:9). These contradictions are unrelated to the individual plaintiffs' credibility – Plaintiffs' truthful testimony reveals that they experienced significantly different employment circumstances, rather than a common policy of unlawful treatment. The Court could not have known the full extent of these discrepancies when considering Plaintiffs' motion for conditional certification, but discovery has exposed the lack of commonality across either the Collective or the Class. The notion that there is a common theme of unlawful conduct by supervisors, who somehow created an alternative unwritten policy, is belied by the Plaintiffs' testimony, warranting decertification.

### 3. Plaintiffs' Expert Provided No Reliable Measure By Which To Calculate Class-Wide Damages.

The parties exchanged expert reports on April 13, 2021. Plaintiffs' expert witness, Dr. Brian Kriegler, does not offer an opinion as to whether any individual plaintiffs have a claim for damages or the amount of any such damages. (*See* Report of Dr. Brian Kriegler ("Kriegler

Report")) (attached hereto as **Exhibit 3**). Dr. Kriegler issued his Rebuttal Report on May 11, 2021 ("Kriegler Rebuttal") (attached hereto as **Exhibit 4**), and was deposed thereafter on June 4, 2021.[2]

Dr. Kriegler's Report attempts to accomplish two objectives: (1) it appears to suggest that the number of Plaintiffs who cancelled their lunch deductions increased after the Complaint was filed (implying this change occurred *because* Plaintiffs filed the Complaint); and (2) it proposes a methodology through which the factfinder could purportedly arrive at a class-wide damages calculation, though it does not supply the key data needed to reach such a calculation.

The missing input in this methodology, however, is "whether or not a given shift included an uncompensated, missed, or interrupted meal break." (Rebuttal Report of Dr. Jonathan Walker ("Walker Rebuttal Rpt."), at ¶ 8) (attached hereto as **Exhibit 5**). This is particularly problematic because many Plaintiffs provided speculative answers in discovery; only a fraction of the number of deposed plaintiffs "answered consistently between the interrogatory response and deposition questioning," and Dr. Kriegler "is guessing about what their vague responses mean." (Walker Rebuttal Rpt., at ¶¶ 16, 18). Under the circumstances, "there is no basis to assume that [the deposed plaintiffs'] responses about frequencies [of missed or interrupted lunch breaks] are anything more than guesses or that average frequencies were calculated with the proper limitations." (Walker Rebuttal Rpt., at ¶ 17).

C.   **Plaintiffs Provided A Lengthy Witness List But Have Refused To Produce A Trial Plan.**

Plaintiffs timely provided their Designation of Potential Trial Witnesses (the "Witness List"), a copy of which is attached hereto as **Exhibit 6**. The Witness List includes twenty-seven

---

[2] Marietta filed its Motion to Exclude the Kriegler Report, the Kriegler Rebuttal, and any related testimony on June 18, 2021. (ECF No. 298). Marietta incorporates the arguments of that motion here to the extent Plaintiffs intend to rely on either of Dr. Kriegler's reports to support their response to the instant motion.

(27) plaintiffs (the "Witnesses"), each of whom is a member of either the FLSA Collective or the Rule 23 Class and each of whom was subject to the written discovery and deposition process described in Marietta's *Daubert* Motion. In short, the Witnesses' testimony plainly demonstrates that their experiences are not similar enough for the claims to proceed collectively.

In an effort to address this concern without judicial involvement, Marietta's counsel contacted Plaintiffs' counsel on April 28, 2021 to request that Plaintiffs provide a trial plan before May 11, 2021. Plaintiffs' counsel responded on May 3 and, without explanation, declined to provide a trial plan. At this stage of the litigation, Plaintiffs should be capable of communicating to the satisfaction of the Court how they plan to try the case, yet have refused to do so. Under the circumstances, neither the Court nor Marietta can determine how this trial might proceed, and the Court should decertify both the Collective and the Rule 23 Class.

## III.    THE COURT SHOULD DECERTIFY THE FLSA COLLECTIVE

### A.    Standard of Review.

Section 216(b) establishes two requirements for a representative action: 1) the plaintiffs must actually be "similarly situated" to the Named Plaintiffs; and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action. 29 U.S.C. § 216(b); *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 167–68, 110 S. Ct. 482 (1989). Similarly situated persons are permitted to "opt into" the suit. *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). Determining whether the plaintiffs are similarly situated is typically a two-step process: at the notice stage, "certification is conditional," not final, and the Named Plaintiffs must show only "that [their] position is similar, not identical, to the positions held by the putative class members." *Id.* at 546-47 (internal quotations omitted). As this Court described in its Certification Order, at the conditional-certification phase, "named plaintiffs need only make a modest factual showing that they are similarly situated to proposed class members," which "typically results in conditional

certification of a representative class." (Certification Order at 7) (citing *Comer*, 454 F.3d at 547). At this stage, the Court "does not generally consider the merits of the claims, resolve factual disputes, or evaluate credibility." (*Id.*) (quoting *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759, 764 (N.D. Ohio 2015)).

Once discovery is complete, as in this case, the "second stage" review of class certification is more stringent, requiring the Court to "examine more closely the question of whether the members of the [collective] are, in fact, similarly situated." *Comer*, 454 F.3d at 547. Even though Marietta moves for decertification, the Named Plaintiffs bear the burden of proving they are similarly situated to the rest of the Collective. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012). The Court considers all the evidence to determine whether the assembled collective should be decertified, leaving plaintiffs free to pursue their claims individually. "[T]he question is simply whether the differences among the [p]laintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 994 (W.D. Tenn. 2011). Here, the differences among the Opt-In Plaintiffs outweigh any similarity in the "practices to which they were allegedly subjected," necessitating decertification of the Collective.

### B.    Marietta's Lunch Deduction Policy Complies With The FLSA.

As an initial matter, Marietta's lunch deduction policy complies with the FLSA. The Sixth Circuit has repeatedly held that "[a]n automatic meal deduction system," like Marietta's lunch deduction, "is lawful under the FLSA." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012); *see also Hill v. United States*, 751 F.2d 810 (6th Cir. 1984) (Upholding the U.S. Postal Service's automatic 30 minute lunch deduction system in FLSA suit brought by a postman-plaintiff who claimed to have been continuously on duty during his mealtime and thus entitled to compensation for that time). In recent decisions addressing automatic lunch deduction

policies, the Sixth Circuit explained that an employer who "establishes a reasonable process for an employee to report uncompensated work time" is "not liable for non-payment if the employee fails to follow the established process." *White*, 699 F.3d at 876; *Jones-Turner v. Yellow Enteprise Sys., LLC*, 597 F. App'x 293, 298 (6th Cir. 2015). Where an employee does not follow a legitimate, reasonable process for reporting their time, this "prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *Jones-Turner*, 597 F. App'x at 298 (affirming decertification of FLSA collective of EMT drivers where evidence showed that many plaintiffs failed to complete exception logs when they worked through lunch, but were paid for missed lunches reflected on completed logs); *see also Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 851 (N.D. Ohio 2013) (decertifying collective of patient care employees alleging defendant health care system's automatic lunch deduction policy violated FLSA). As the Named Plaintiffs can point to no common unlawful policy uniting their claims, they bear the burden of demonstrating they are similarly situated to the rest of the Opt-In Plaintiffs despite the myriad of differences in their respective employment settings and the individualized defenses Marietta will need to present in response to their claims.

## C. The Opt-In Plaintiffs Are Not Similarly Situated To The Collective, Thus The Court Should Decertify the Collective.

To proceed as a collective, the Named Plaintiffs bear the burden of proving they are similarly situated to the rest of the Collective. *Frye v. Baptist Mem'l Hosp., Inc.*, 495 Fed. App'x. 669, 672 (6th Cir. 2012). Although the FLSA does not define what it means for plaintiffs to be "similarly situated," courts in the Sixth Circuit consider the following factors: "(1) the disparate factual and employment settings of the individual plaintiffs, such as a) job duties; b) geographic location; c) supervision; and d) salary; (2) the various defenses available to the defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Monroe*,

11

763 F. Supp. 2d at 994; *see also Frye*, 495 Fed. App'x. at 671–72; *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016).

This Court previously concluded that the Named Plaintiffs had made the "modest factual showing" required of them at the conditional certification stage by "alleging that they and other workers were often unable to take meal breaks and were discouraged from canceling the automatic deduction when they could not take a break." (ECF No. 42 at 17) ("FLSA Certification Order"). Now, with the benefit of a robust discovery record at the "second stage" review, the Court's inquiry is more detailed, and "Plaintiffs generally must produce more than just allegations and affidavits demonstrating similarity in order to achieve final certification." *Frye*, 495 Fed. App'x. at 671 (quotation omitted).

In this case, the evidence demonstrates that: (1) Plaintiffs experienced unique employment circumstances (with statistically significant discrepancies across units, supervisors, and shifts worked, among other factors); (2) Marietta will need to present individualized defenses in response to each of the Plaintiffs' unique, circumstantial claims; and (3) attempting to try these distinct claims collectively would be adverse to the interest of fairness and efficiency. Accordingly, the Court should decertify the Collective.

> 1.    **Whether Any Plaintiff Suffered A Compensable FLSA Injury Depends On Numerous Unique Employment Circumstances, Necessitating Decertification Of The Collective.**

Determining whether any plaintiff suffered a compensable FLSA injury will depend on numerous employment circumstances unique to the individual plaintiffs. Though this information was not readily apparent at the conditional-certification stage, the Plaintiffs' unique employment circumstances are clear now, and thus the Court should decertify the Collective.

Numerous courts have decertified collective actions, like this one, in which the collective is comprised of plaintiffs who worked for the same employer and subject to the same legal policy, but whose claims arose from differing employment circumstances. These claims are particularly common in the healthcare industry. Indeed, numerous courts have decertified similar claims. For example, in *Camesi v. University of Pittsburgh Medical Center*, the district court decertified a collective of patient care employees who were subject to an auto-deduction policy similar to Marietta's. 2011 WL 6372873 (W.D. Penn. 2011). As here, the auto-deduction in *Camesi* applied to all the plaintiffs, and each plaintiff was responsible for logging their missed lunch breaks. As in this case, the plaintiffs' employment circumstances varied significantly: the collective was comprised of plaintiffs holding many different job titles and responsibilities and who reported to hundreds of different supervisors. *Id*. at *7–8. The court explained that the differences in plaintiffs' job duties were particularly important, because "[the plaintiffs'] job duties dictated whether and why they experienced missed or interrupted meal breaks." *Id*. at *8 (citing *White v. Baptist Mem'l Health Care Corp.*, 2011 WL 1883959, at *7 (W.D. Tenn. 2010), *aff'd* 699 F.3d 869 (6th Cir. 2012)). The widespread variation in these duties "seem[ed] self-apparent," and coupled with the "decentralized nature of [defendant's] implementation and enforcement of the meal break policies[,]" "strongly favor[ed] decertification." *Id*.

Similarly, in *Kuznyetsov v. West Penn Allegheny Health System, Inc.*, the court decertified a class of 806 plaintiffs who held many different job titles, performed varying duties, and worked for hundreds of different supervisors. 2011 WL 6372852, at *5–6 (W.D. Penn. 2011). The court explained that while the plaintiffs' job duties need not be identical to survive a decertification motion, "substantial diversity" among the plaintiffs weighed against awarding final certification. *Id*. The court further concluded that the heavy involvement of supervisors in implementing the

13

auto-deduct policy "exponentially compound[ed] the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency." *Id.*

Other courts have also decertified collective actions where the challenged policy complied with the FLSA but plaintiffs from dissimilar employment settings alleged that the defendant informally implemented a "policy to violate the policy." *See, e.g. Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 854-56 (N.D. Ohio 2013) (decertifying collective of patient care workers and explaining, "Yes, all Plaintiffs were subject to the auto-deduct policy, but the application of the policy varied based on several factors, including job duties and individual managers at the various [defendant] facilities. . . . The factual variations among individual Plaintiffs and among facilities weigh heavily in favor of decertification"); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 936 (E.D. Ark. 2012) (decertifying collective and explaining, "each plaintiff's case requires consideration of different background facts and different testimony based on each [plaintiff's] work activities. Failing to decertify the conditionally-certified class will unfairly and prejudicially require [defendant] to prepare for and present hundreds of different trials simultaneously."); *Blaney v. Charlotte–Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *7–8 (W.D.N.C. 2011) (decertifying opt-in collective and noting "[w]hen alleged FLSA violations stem from the enforcement of decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate"); *see also Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 588 (E.D. La. 2008); *Roussell v. Brinker Int'l, Inc.*, CIV.A. H–05–3733, 2008 WL 2714079, *22 (S.D. Tex. 2008); *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286, at *4 (S.D. Tex. 2005).

As in the foregoing cases, Plaintiffs in this case lack the commonality of employment circumstances necessary to proceed as a collective, and even if collective treatment could be viable, the Named Plaintiffs are not similarly situated to the rest of the Collective.

        **a.**      ***A Single Supervisor Is The Named Plaintiffs' Only Common Experience Evidencing Marietta's Supposed "Policy To Violate The Policy."***

The only commonality that emerges from the deposed Opt-In Plaintiffs' testimony is that one single supervisor purportedly reprimanded each of the Named Plaintiffs for failing to take a lunch break. Named Plaintiff Lynnett Myers testified that she was reprimanded by her supervisor, Amanda Reiss Morus ("Ms. Morus"), for canceling her lunch deduction after working through her lunch break. (Myers Dep. at 120:20-22). Named Plaintiff Carol Butler testified to a similar incident. (Butler Dep. at 111:10-112:20). Named Plaintiff Arva Lowther testified that only Ms. Morus ever reprimanded her for canceling the lunch deduction, even though she reported to several other supervisors during the Class Period. (Lowther Dep. at 153:2-4). Myers also agreed that Ms. Morus may have been the only supervisor who ever reprimanded any employees for canceling their lunch deduction. (Myers Dep. at 121:6-14). Thus, by the Named Plaintiffs' description, Ms. Morus' actions were inconsistent with the actions of other supervisors, demonstrating that the Named Plaintiffs are not similarly situated to the rest of the Collective.

        **b.**      ***No Opt-Ins Apart From The Named Plaintiffs Experienced Similar Treatment From Their Supervisors.***

The other three deposed Opt-Ins reported no reprimands comparable to those that the Named Plaintiffs described receiving from Ms. Morus. (Clegg Smith Dep. at 46:18-23; Weckbacher Dep. 29:12-30:6; Hanlon Dep. at 31:23-32:19). Opt-In Plaintiff Mary Clegg Smith testified that no one ever told her not cancel the lunch deduction. (Clegg Smith Dep. at 46:18-23). Opt-In Plaintiff Kim Weckbacher was not discouraged from canceling the deduction, but instead

testified that she was unsure how to cancel the deduction, could not always remember to do so when clocking out, and/or had difficulty accessing the computer where she could input her cancellation. (Weckbacher Dep. 29:12-30:6). Finally, Opt-In Plaintiff Stacy Hanlon testified that she could not remember a supervisor discouraging her from cancelling lunch deductions. (Hanlon Dep. at 31:23-32:19). This discrepancy is not an issue of credibility – taking Plaintiffs' discovery responses and testimony as truthful, their disparate experiences demonstrate that the Named Plaintiffs are not similarly situated to the rest of the Collective, and consequently, that decertification is warranted.

###### c. *The Named Plaintiffs' Supervisors Represent A Miniscule Fraction Of All Plaintiffs' Supervisors.*

The lack of consistency between the Named Plaintiffs' experiences and those of the other Opt-Ins is even more problematic when considering the total number of all Marietta supervisors. Between 2012 and 2018, Marietta employed an average of 132 individuals in roles supervising direct patient care workers. (Declaration of Dan Weaver ("Weaver Decl.") attached hereto as **Exhibit 7**, at ¶ 8). The exact number of supervisors varied from year to year, with a low of 125 supervisors and a high of 137 supervisors. (*Id.* at ¶ 9). The Named Plaintiffs accuse a single supervisor of enacting Marietta's supposed "policy to violate the policy" by reprimanding them for canceling the lunch deduction, but this single supervisor (Ms. Morus) represents less than 1% of the total population of direct patient care supervisors during the Class Period. Not only is Ms. Morus an outlier from a mathematical standpoint, but none of the other deposed Opt-In Plaintiffs (Mary Clegg Smith, Kim Weckbacher, and Stacy Hanlon) experienced similar treatment from their supervisors. Indeed, both Ms. Clegg Smith and Ms. Weckbacher testified that neither of their respective supervisors ever discouraged them from cancelling the lunch deduction. (Clegg Smith Dep. at 46:18-23; Weckbacher Dep. 29:12-30:6), and Ms. Hanlon could not recall ever having

16

been discouraged. (Hanlon Dep. at 31:23-32:19). If Plaintiffs cannot tell a consistent story when describing the conduct of only a handful of supervisors, what common story could they possibly tell regarding the other 99% of supervisors? Taken together, Plaintiffs' own evidence conclusively demonstrates that Marietta supervisors did not implement a uniform "policy to violate the policy." No such pattern emerges from the conduct of the supervisors to whom the Named Plaintiffs and deposed Opt-In Plaintiffs reported, evidencing that the Named Plaintiffs are not similarly situated to the rest of the Collective, and thus that the Court should decertify the Collective.

        **d.**      ***The Lack Of A Cohesive "Policy To Violate The Policy" Is Even More Apparent In The Testimony Of Plaintiffs' Potential Trial Witnesses.***

The lack of a common "policy to violate the policy" implemented by Plaintiffs' supervisors is even more pronounced when the Named Plaintiffs' experiences are considered alongside the deposition testimony of Plaintiffs' other potential trial witnesses. Specifically, ten Witnesses testified that no supervisor discouraged them from canceling the lunch deduction when they were unable to take a lunch break. (Wilson Dep. at 21:17-20; Casto Dep. at 14:23-15:3; King Dep. at 9:19-21; Konkler Dep. at 17:4-11; Adams Dep. at 15:13-19; Bucheit Dep. at 24:21-24; McCutcheon Dep. at 8:8-10; Maxwell Dep. at 26:5-8; Smith Dep. at 18:17-20; Schaad Dep. at 18:6-9).

- Q: And isn't it true that no supervisor ever discouraged you from canceling the automatic lunch deduction? A: Yes. (Wilson Dep. at 21:17-20).

- Q: None of your supervisors ever discouraged you from canceling your lunch? A: No. Q: No, they did not? A: No, they did not discourage me. (Casto Dep. at 14:23-15:3).

- Q: Did any supervisor ever tell you that you should not cancel your lunch deductions? A: No. (King Dep. at 9:19-21).

- Q: And earlier Mr. Wilson asked you about whether a supervisor ever encouraged or discouraged you from clocking out no lunch. A: Uh-hum. Q: And I believe that you answered the question no. I want to make sure that that answer is no for both of your locations. A: Correct, it is no for both locations. (Konkler Dep. at 17:4-11).

- Q: And also in these interrogatories you were specifically asked whether any supervisor or manager advised you to -- that you should not cancel an automatic lunch deduction, and your answer was there was no such conversation; is that right[?] A: That's correct. (Adams Dep. at 15:13-19).

- Q: And is it also true, ma'am, that no supervisor ever told you that you could not cancel your interrupted lunches? A: Correct, not that I recall. (Bucheit Dep. at 24:21-24).

- Q: Have any of your supervisors discouraged you from cancelling your lunch deduction? A: No. (McCutcheon Dep. at 8:8-10).

- Q: One more question, ma'am. No supervisor ever told you that you could not cancel your lunch; is that right? A: No, nobody ever talked to me about that, no. (Maxwell Dep. at 26:5-8).

- Q: And while you were a registration receptionist, you were never discouraged from canceling your lunch deduction, correct? A: Correct. (Smith Dep. at 18:17-20).

- Q: Do you recall any of your supervisors ever telling you not to cancel a lunch deduction? A: No. (Schaad Dep. at 18:6-9).

Other Witnesses testified either that the lunch deduction policies had changed over time, they were not aware of the policy, or could not answer with certainty as to whether any supervisor had discouraged them from canceling the lunch deduction:

- Q: In the last five years, has any manager directly or indirectly discouraged you from canceling your automatic lunch deductions? A: Not that I recall, not since Allison Johnson took over as manager on our unit on 3 South when it was turned into observation and neither has my manager currently, no, they do not question. (Fitzwater Dep. at 30:11-19).

- Q: Did a supervisor ever tell you that you should not clock out no lunch? A: I have never had that conversation. I was not aware that we could clock out no lunch. (Gordon Dep. at 9:15-18).

- Susan Jahn testified to changes in policy regarding cancellations that lead to different perceptions of how or when to cancel the lunch deduction. (Jahn Dep. at 26-36).

As in *Creely*, the "factual variations among individual Plaintiffs . . . weigh heavily in favor of decertification." 920 F. Supp. 2d at 854-56; *see also White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 375 (E.D. Mo. 2014) (explaining that representative evidence and testimony is unhelpful "where the plaintiff was not subject to the same policy as the collective class."); *Roussell v. Brinker*

*Int'l, Inc.*, CIV.A. H–05–3733, 2008 WL 2714079, *22 (S.D. Tex. July 9, 2008) ("the use of representative testimony is justified only where it is reasonable to believe that the testifying witnesses' experiences are sufficiently similar to those of the rest of the non-testifying plaintiffs").

Moreover, as Plaintiffs claim a "policy to violate the policy," Marietta should be permitted to offer testimony from as many supervisors as it chooses in order to debunk the class claims. On that score, if the Named Plaintiffs are permitted to assert that their experiences with Ms. Morus are somehow representative of the experiences of the Collective and/or the Class, Marietta would be denied a fair trial if it could not confront that testimony with supervisors other than Ms. Morus. The resulting inefficiencies in the adjudication of Plaintiffs' claims proves the point—since there are no common answers to common questions, this case is not suitable to class treatment.

Given the widespread variations among the Opt-In's experiences, the Court will need to examine each Opt-In's unique circumstances to determine whether he or she suffered a compensable injury – an issue that undermines the merits Plaintiffs' claims, not their individual credibility. The Named Plaintiffs are not similarly situated to the Collective, and the Court should decertify the Collective.

### 2. Marietta Will Need to Present Individualized Defenses In Response To The Opt-In Plaintiffs' Individualized Allegations.

In response to Plaintiffs' varying allegations, Marietta will need to present individualized defenses, thus the second prong of the Court's analysis weighs in favor of decertification. Courts routinely find that plaintiffs cannot proceed as a class or collective where adjudication of their claims would require the defendant to present individualized defenses. *See, e.g. Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 486 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011) (Where plaintiffs planned to rely on individuals' varied testimony at trial to establish FLSA violations, court granted motion to decertify, finding "There is a significant risk that the trial would

become an unmanageable set of mini-trials on the particular individuals presented as witnesses."); *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 378 (E.D. Mo. 2014) ("The evidence indicates that Plaintiffs' claims are individualized and dependent upon factors (such as the manager on duty, the [salon] location [where each plaintiff worked], the amounts earned, etc. that preclude collective treatment."); *Johnson*, 561 F. Supp. 2d at 588 ("The purpose of a collective action is to try several claims, rather than multiple individual trials."); *Camesi*, 2011 WL 6372873, at *9 (decertifying FLSA collective in light of defendant's individualized defenses which included whether individual plaintiffs were, in fact, deprived of overtime compensation).

In an analogous case from the Northern District of Ohio, the trial court decertified a collective of patient care providers who alleged that their employer's auto-deduction policy deprived the plaintiffs of overtime compensation allegedly earned by working through their lunch breaks. *Creely*, 920 F. Supp. 2d at 856. In determining that the plaintiffs' claims would necessarily require the defendant to present individualized defenses, the court explained that the "knowledge and testimony of each [plaintiff's] individual manager will be highly relevant and necessary to the defenses Defendant may assert." *Id.* Specifically, the plaintiffs would need to present testimony from their respective managers "regarding, for example, actual or constructive knowledge that a Plaintiff worked through a meal break without compensation, and the actual training provided to a Plaintiff regarding the auto-deduct policy[.]" *Id.* Under the circumstances, the court concluded, "individualized defenses would overwhelm any trial of this case as a collective action." *Id.*

Here, as in *Creely*, Plaintiffs' diverging testimony shows that Marietta will need to present individualized defenses to the Opt-In Plaintiffs' claims, justifying decertification of the Collective. These defenses will likely include showing that particular persons were trained (even though other Plaintiffs concede the issue), that particular supervisors did not discourage cancellations (even

20

though many Plaintiffs do not assert that they were discouraged), that the cancelled deductions were paid in specific instances (even though many Plaintiffs do not claim otherwise), and so on. This testimony will necessarily include testimony from the Witnesses' supervisors and peers, whose actions (by the Witnesses' own description) varied significantly from person to person, supervisor to supervisor, and unit to unit. Given that this evidentiary quagmire is as deep as it is wide, "individualized defenses would overwhelm any trial of this case as a collective action," and the Court should accordingly decertify the collective.

### 3. Fairness And Procedural Considerations Weigh In Favor Of Decertifying The Collective.

Finally, fairness and procedural considerations weigh in favor of decertifying the Collective. A collective action must be managed such that no party is unduly prejudiced. *Kuznyetsov*, 2011 2011 WL 6372852, at *13. Where, as here, the plaintiffs cannot prove their case through representative evidence, the court should decertify the collective. As the district court explained in *Johnson v. Big Lots Stores, Inc.*, "the more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits - for either side - that is reached on the basis of purportedly representative evidence." 561 F. Supp. 2d 567, 574 (E.D. La. 2008). Many courts that have considered unpaid meal break claims similar to Plaintiffs' have determined that such claims are far too individualized to be managed effectively through a collective trial. *Creely*, 920 F. Supp. 2d at 856; *Camesi*, 2011 WL 6372873, at *9; *Kuznyetsov*, 2011 2011 WL 6372852, at *27-28; *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, **33-35 (S.D.N.Y. 2011).

Discovery has revealed that conducting a trial of Plaintiffs' claims would create enormous manageability and fairness problems because the Opt-In Plaintiffs cannot show that they were similarly situated or suffered a common FLSA injury, evidence which was not available to the

Court when it considered Plaintiffs' conditional certification motion. *See, e.g. Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286, at *33 (S.D. Tex. Aug. 17, 2005) (citations omitted). The establishment of each Plaintiff's right to overtime compensation under the FLSA hinges on individual experiences, including but not limited to what each plaintiff understood about the lunch deduction policy, what shifts they worked, and how their individual supervisor(s) behaved. As such, adjudicating the Opt-In Plaintiffs' claims would force the Court to conduct a series of "mini-trials," defeating the purpose of a collective action. *Johnson*, 561 F. Supp. 2d at 574. Accordingly, as the Opt-In Plaintiffs cannot carry their burden on any of the three prongs of the decertification analysis, the Court should decertify the Collective.

**IV.**     **THE COURT SHOULD DECERTIFY THE RULE 23 CLASS**

    **A.**     **Standard of Review.**

To be properly certified, a putative class must meet the four "threshold requirements" of Federal Rule of Civil Procedure 23(a):

> (1) numerosity (a class so large that joinder of all members is impracticable);
>
> (2) commonality (questions of law or fact are presented which are common to the class);
>
> (3) typicality (the named parties' claims or defenses are typical of the class); and
>
> (4) adequacy of representation (the named representatives will fairly and adequately protect the interests of the class).

*Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089-1090 (6th Cir. 2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In addition to satisfying the requirements of Rule 23(a), Plaintiffs must show that the Class meets the requirements of one of Rule 23(b)'s three subdivisions. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). Plaintiffs cannot satisfy the commonality and typicality

requirements, nor can they carry their burden of proving the requirements of Rule 23(b)(3) are satisfied. Accordingly, the Court should decertify the Rule 23 Class.

**B.** **Plaintiffs Can Satisfy Neither The Commonality Nor Typicality Requirements Of Rule 23(a).**

Plaintiffs cannot satisfy the Rule 23(a)(2) commonality requirement because the factual and legal questions Plaintiffs present are not capable of class-wide resolution.[3] Plaintiffs similarly cannot satisfy the Rule 23(a)(3) typicality requirement because the Named Plaintiffs' claims do not fairly encompass the claims of the Class Plaintiffs. Accordingly, the Court should decertify the Class.

**1.** **Plaintiffs' Claims Lack Sufficient Commonality In Violation Of Rule 23(a)(2).**

Under Rule 23(a)(2), Plaintiffs must show that "there are questions of law or fact common to the class." *Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013); FED. R. CIV. P. 23(a)(2). Merely presenting the same legal claim or asserting violations of the same policy are insufficient; instead, a question of law or fact is common to the class if it is "capable of classwide resolution— which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541 (2011) (hereinafter, "*Dukes*").

In its Order conditionally certifying the Rule 23 Class, this Court noted that the commonality requirement was satisfied at the time because while the Named Plaintiffs "may have testified that they did not cancel their lunch deductions for varying reasons, [they also] uniformly testified that they were discouraged from doing so." (ECF No. 171, at 13). Such "uniform[ity]" is

---

[3] Marietta does not dispute that the numerosity and adequacy prongs are satisfied in this case, though Plaintiffs' failure to satisfy the remaining prongs demonstrate that the Court should nonetheless decertify the Rule 23 Class.

absent from the Rule 23 Plaintiffs' deposition testimony. Though Rule 23 does not require absolute uniformity, the Supreme Court has explained:

> What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Dukes*, 564 U.S. at 350 (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). As the Rule 23 Plaintiffs' claims lack common allegations regarding Plaintiffs' respective awareness of the lunch deduction policy, their usage of the cancellation feature, the manner in which the policy was implemented over time, or whether their supervisors discouraged Plaintiffs from cancelling the lunch deduction, among other issues, the Court should decertify the Rule 23 Class.

### a. *Plaintiffs Described Differing Awareness Of The Lunch Deduction Policy.*

The Rule 23 Plaintiffs' allegations regarding their respective awareness of the lunch deduction policy varies significantly, indicating that their claims lack commonality. "The overwhelming majority of class members knew or should have known that automatic deductions for missed or interrupted meal breaks could be cancelled because they experienced such cancellations." (Walker Rpt. at ¶ 20). Even so, at least two Rule 23 Plaintiffs testified either that they could not cancel their lunch deduction, or that they did not know they had the option to cancel the lunch deduction. (Martin Dep. at 11:24-13:20; Gordon Dep. at 13, 16:24-17:6). Other Plaintiffs testified that they might have been able to cancel the deduction but could not recall how to do so despite having repeatedly cancelled deductions during their employment. (*See, e.g.* Patrick Kegley Dep. at 18-21 (explaining that that there was a book where employees logged their missed lunches, then later agreeing that there was no such book); Maxwell Dep. at 11:9-14, 25:10-18). Still other

24

Plaintiffs had no trouble explaining the policy, the timekeeping program, and the circumstances under which they cancelled their deductions. (*See, e.g.* Konkler Dep. at 10:5-15; Wilson Dep. at 14:24-15:19; King Dep. at 10:6-15; Hooper Dep. at 14:5-12; Miller Dep. at 37-38; McHenry Dep. at 13-14; Grady Dep. at 20:10-24; Fitzwater Dep. at 43-44; Waite Dep. at 17-18; Casto Dep. at 13-15; McCutcheon Dep. at 7:2-8:4). Plaintiffs' lack of a common theory regarding the extent, if any, that they understood the lunch deduction policy weighs in favor of decertification and demonstrates that the commonality prong of Rule 23(a)(2) is not satisfied here.

> **b.    *Plaintiffs' Testimony And Actual Cancellation Of The Lunch Deduction Varied Among Different Departments And Job Codes.***

The Rule 23 Plaintiffs also offered competing testimony with respect to whether they did, in fact, cancel their lunch deductions at any time. "Eighty-four percent of class members in the Kronos data had at least one cancelled meal break deduction, and eight percent cancelled the meal break deduction on at least half of their shifts." (Walker Rpt. at ¶ 19). Despite this widespread usage of the lunch deduction, few Plaintiffs could accurately recall having cancelled lunch deductions. (*Compare* Nichols Dep. at 19:16-19 *with* Bucheit Dep. at 17:2-4; McHenry Dep. at 31:13-33:1). One deponent, Jessica Fitzwater, testified that she could not recall having cancelled lunch deductions, but an exhibit setting forth her cancellations demonstrated that she had cancelled her lunch deduction almost every week during a multi-year period. Ms. Fitzwater ultimately agreed that she had cancelled her lunch deduction during the vast majority of her workweeks. (Fitzwater Dep. at 30-40). Representative witnesses' testimony should not vary to this degree in a class or collective action, underscoring why Plaintiffs' claims lack the commonality required by Rule 23(a)(2).

        ***c.    The Rule 23 Plaintiffs Cannot Tell a Coherent Story Regarding Their Various Supervisors And What, If Any, Role their Supervisors Played In Their Decisions To Cancel The Lunch Deduction.***

While the Named Plaintiffs initially presented a coherent story regarding their supervisor's actions, the Rule 23 Plaintiffs cannot tell a similarly cohesive story regarding their various supervisors and what, if any, role their supervisors played in their respective decisions to cancel their lunch deduction. Specifically, ten deposed Rule 23 Plaintiffs testified that no supervisor discouraged them from canceling the lunch deduction when they were unable to take a lunch break:

- Q: And isn't it true that no supervisor ever discouraged you from canceling the automatic lunch deduction?  A: Yes. (Wilson Dep. at 21:17-20).

- Q: None of your supervisors ever discouraged you from canceling your lunch?  A: No. Q: No, they did not?  A: No, they did not discourage me. (Casto Dep. at 14:23-15:3).

- Q: Did any supervisor ever tell you that you should not cancel your lunch deductions? A: No. (King Dep. at 9:19-21).

- Q: And earlier Mr. Wilson asked you about whether a supervisor ever encouraged or discouraged you from clocking out no lunch.  A: Uh-hum.  Q: And I believe that you answered the question no. I want to make sure that that answer is no for both of your locations.  A: Correct, it is no for both locations. (Konkler Dep. at 17:4-11).

- Q: And also in these interrogatories you were specifically asked whether any supervisor or manager advised you to -- that you should not cancel an automatic lunch deduction, and your answer was there was no such conversation; is that right[?]  A: That's correct. (Adams Dep. at 15:13-19).

- Q: And is it also true, ma'am, that no supervisor ever told you that you could not cancel your interrupted lunches?  A: Correct, not that I recall. (Bucheit Dep. at 24:21-24).

- Q: Have any of your supervisors discouraged you from cancelling your lunch deduction? A: No. (McCutcheon Dep. at 8:8-10).

- Q: One more question, ma'am. No supervisor ever told you that you could not cancel your lunch; is that right?  A: No, nobody ever talked to me about that, no. (Maxwell Dep. at 26:5-8).

- Q: And while you were a registration receptionist, you were never discouraged from canceling your lunch deduction, correct?  A: Correct. (Smith Dep. at 18:17-20).

- Q: Do you recall any of your supervisors ever telling you not to cancel a lunch deduction? A: No. (Schaad Dep. at 18:6-9).

At least one other Rule 23 Plaintiff could not recall whether a supervisor discouraged him from cancelling his lunch deductions:

- Q: Okay. Do you recall your supervisor, and, again, we're referring to Mr. Kamal because I know you didn't -- not clear on his last name, do you recall him ever telling you not to cancel your lunch deduction? A: I don't remember him telling me not to, no. (Dye Dep. at 15:15-19).

Other Rule 23 Plaintiffs testified either that the lunch deduction policies had changed over time, they were not aware of the policy, or could not answer with certainty as to whether any supervisor had discouraged them from canceling the lunch deduction:

- Q: In the last five years, has any manager directly or indirectly discouraged you from canceling your automatic lunch deductions? A: Not that I recall, not since Allison Johnson took over as manager on our unit on 3 South when it was turned into observation and neither has my manager currently, no, they do not question. (Fitzwater Dep. at 30:11-19).

- Q: Did a supervisor ever tell you that you should not clock out no lunch? A: I have never had that conversation. I was not aware that we could clock out no lunch. (Gordon Dep. at 9:15-18).

- Susan Jahn testified to changes in policy regarding cancellations that lead to different perceptions of how or when to cancel the lunch deduction. (Jahn Dep. at 26-36).

No common proof unites these claims. While the Named Plaintiffs argue that Marietta implemented a covert policy discouraging patient care employees from canceling their lunch deductions, roughly one-third of Plaintiffs' proposed trial witnesses never experienced such treatment, several more could not recall one way or the other, and many others provided conflicting accounts of how this supposed policy played out. By definition, adjudicating the claims of several thousand plaintiffs, who collectively worked over one million shifts during the Class Period, implicates possibly millions of individual employment decisions by the Rule 23 Plaintiffs and their supervisors alike. "Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce

27

a common answer to the crucial question" of why some Plaintiffs worked through lunches without canceling their lunch deduction. *Dukes*, 564 U.S. at 352. As evidenced by the deposed Rule 23 Plaintiffs' testimony, no common story can be extrapolated to the entire Rule 23 Class, thus the claims lack sufficient commonality as required by Rule 23(a)(2).[4]

> ### d. The Record Shows Statistically Significant Changes In Plaintiffs' Cancellation Of The Lunch Deduction Over Time.

The record demonstrates statistically significant changes in Plaintiffs' cancellation of the lunch deduction over time (Walker Rpt. at ¶ 24), further evidencing the absence of commonality among Plaintiffs' claims. Plaintiffs' expert implies that this change is attributable to the pendency of this litigation. (*See* Kriegler Rpt. at ¶ 19). But in fact, "[t]he changes in cancellation rates over time are not consistent across job codes and departments." (Walker Rebuttal Rpt. at ¶ 30).

For example, Figure 3 in the Walker Report shows that there were 166 shifts of five and a half hours or longer in the Marietta Memorial Hospital Denials Management department. (Walker Rpt. at ¶ 25). Cancelled deductions were claimed on 163 of these 166 shifts, or 98.2% of the shifts logged by Plaintiffs in this department during the Class Period. (*Id.*). On the other hand, 22 departments, reflecting a total of 6,646 shifts among them, had no cancelled lunch deductions during the same period. (*Id.*). The frequency of cancelled deductions across the 15 departments with the highest percentages of cancellations is 64.6% while the frequency of cancelled deductions across the bottom 15 departments is 0.1%. The probability of observing by random chance a disparity this large between the top 15 and bottom 15 departments is less than one in one hundred

---

[4] Extrapolation is further inappropriate given that the plaintiffs who participated in discovery constitute a non-random, non-representative sample, influenced by non-response bias (among other issues). As described in Marietta's Motion to Exclude the Report and Testimony of Expert Dr. Brian Kriegler, these methodological errors render unreliable any inferences drawn from the Discovery Plaintiffs when extrapolated to the entire Rule 23 Class.

thousand, indicating that meaningful differences distinguish the employment circumstances of Plaintiffs in these various departments. (Walker Rpt. at ¶¶ 27-28).

Similarly, "huge" variations exist in the rates of cancellation across the 266 different job codes in which Plaintiffs were employed. (Walker Rpt. at ¶ 29). For job titles with at least 100 shifts worked during the Class Period, the frequencies of cancelled lunch deductions range from a high of 98.1% for "Financial Representative Non Certified Coder" to 0% among 3,187 shifts for "Laboratory Operations Supervisor." (*Id.* at ¶ 30). The median percentage of shifts with cancelled deductions among jobs with at least 100 shifts worked during the class period is 6%. (*Id.*). The frequency of cancelled deductions across 15 jobs with the most cancellations is 60.3% while for the 15 jobs with the fewest cancellations the frequency is 0%. (*Id.* at ¶ 31). The probability of observing by random chance a disparity this large between the top 15 and bottom 15 jobs shown is less than one in one hundred thousand. (*Id.*).

As Dr. Walker explains, "[t]he fact that cancellation rates varied materially by time, department and job implies that it would be misleading and inaccurate to treat class members who were employed at different times, in different departments or in different jobs similarly." (Walker Rebuttal at ¶ 30).

Taken together, the record demonstrates that plaintiffs cannot satisfy the commonality requirement of Rule 23. As Dr. Walker explains, "I am unaware of any common proof method to ascertain whether any particular class member or group of class members was ever undercompensated for missed or interrupted meal breaks or how often under-compensation occurred." (Walker Rpt. at ¶ 5). Because no common proof unites Plaintiffs' claims, the commonality requirements of Rule 23(a)(2) are not met, and the Court should decertify the Class.

### 2. Plaintiffs Similarly Cannot Satisfy Rule 23(a)(3)'s Typicality Requirement.

29

The Named Plaintiffs' claims must also be typical of the Rule 23 Plaintiffs' claims, a requirement that Plaintiffs cannot satisfy. The Sixth Circuit has explained that the typicality requirement is met if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc). This requirement ensures that the Named Plaintiffs' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the Named Plaintiffs also advocate the interests of the class members. *Id.*

In granting conditional certification, the Court concluded that Plaintiffs had satisfied the typicality requirement of Rule 23 because the Named Plaintiffs "stated that they spoke with many coworkers who were subject to the same policies and practices—of not receiving lunch breaks, of being told not to clock out no lunch, and of not being paid for all hours worked." (Class Certification Order, at 14). At this stage, with the benefit of approximately sixty interrogatory responses and nearly thirty depositions, the Court need not rely on the Named Plaintiffs' characterization of their colleagues' experiences. Indeed, the Rule 23 Plaintiffs who participated in discovery gave conflicting testimony on each of these key issues – whether they were able to take breaks, whether they were ever told to clock out no lunch, and whether they were paid for all hours worked. These conflicts do not indicate that the Plaintiffs lack credibility – rather, the Plaintiffs' widely varying testimony (which is not reflected in the Named Plaintiffs' testimony) demonstrates that the Named Plaintiffs' claims do not "fairly encompass" the Rule 23 Plaintiffs' claims, and thus fail to meet the typicality requirement of Rule 23(a)(3).

### a. Whether The Rule 23 Plaintiffs Received A Lunch Break Varied Widely.

Contrary to the Plaintiffs' arguments at the class certification stage, the evidence adduced in discovery demonstrates that individual issues predominate over collective issues with respect to

whether and how the Rule 23 Plaintiffs took or missed lunch breaks. Named Plaintiffs Lynnett Myers, Arva Lowther, and Carol Butler all testified that they did not have scheduled lunch breaks and/or that they could not recall ever having a 30-minute uninterrupted lunch break. (Myers Dep. at 21:11-22:19; Lowther Dep. at 105:19; Butler Dep. at 87:14-18, 110:1-6). But these collective issues do not predominate when the Court considers the testimony of other Rule 23 Plaintiffs. For example, in direct opposition to the Named Plaintiffs' testimony, Rule 23 Plaintiff Susan Jahn testified that lunches in her department were routinely scheduled from 12–1 pm. (Jahn Dep. at 14:15-17). Lorraine Nichols similarly testified that her department had "scheduled times that [were] appropriate" for breaks, and "mostly everybody in the department would . . . take a break[.]" (Nichols Dep. at 11:5-17). Rachel Konkler testified that during her shifts at Selby, staff in her unit do not see patients between 12-1 pm, providing time for a thirty-minute break, but during her shifts at Memorial Hospital, the schedule "is very unstructured" so similar consistency of break time is not possible. (Konkler Dep. at 19:13-25). These Plaintiffs' testimony was further contradicted by others who estimated that they were not necessarily scheduled for breaks but were able to take an uninterrupted lunch during some (if not all) of their shifts. (*See, e.g.* Bucheit Dep. at 13:25-16:2). Still others testified that they never missed a meal break. (*See, e.g.* Creeger Dep. at 15). The Named Plaintiffs' experiences are therefore not typical of the myriad circumstances presented by the Rule 23 Plaintiffs, for reasons unrelated to the Plaintiffs' credibility, and thus their claims are not typical of the Class as required by Rule 23(b)(3).

**b.    *The Named Plaintiffs Shared A Common Supervisor Whose Actions Are Not Typical Of Other Plaintiffs' Supervisors.***

As described *supra* in Section III.C.1.b, the Named Plaintiffs directly reported to only three supervisors amongst them – Jennifer Offenberger and Jessica Cline (each of whom supervised only Arva Lowther and not the other Named Plaintiffs), and Ms. Morus (who supervised all three

Named Plaintiffs). Ms. Lowther testified that only Ms. Morus reprimanded her for canceling the lunch deduction (Lowther Dep. at 153:2-4), and Ms. Myers similarly testified that Ms. Morus may have been the only supervisor who reprimanded employees for canceling their lunch deduction. (Myers Dep. at 121:6-14). By contrast, approximately three-fourths of the plaintiffs who responded to discovery stated that they did not recall supervisors discouraging them from cancelling the lunch deduction. (Walker Rpt. at ¶¶ 18, 53). The Named Plaintiffs' testimony materially contradicts most answers provided by Rule 23 Plaintiffs in discovery, thus the Named Plaintiffs' claims do not "fairly encompass" the Rule 23 Plaintiffs' claims. The Court should therefore conclude that the Named Plaintiffs' claims fail to meet the typicality requirement of Rule 23(a)(3).

### c.   *Numerous Plaintiffs Testified That They Were Paid For All Hours Worked And Have No Claim For Lost Wages.*

While each of the Named Plaintiffs claim that they were not paid for all the hours they worked, this allegation is not shared by all the Rule 23 Plaintiffs. Notably, seven Rule 23 Plaintiffs testified that they have no claim for lost wages. For example, when asked, "Do you believe that you were paid for all your hours worked[,]" Plaintiff Jesse Adams responded "Yes." (Adams Dep. at 20:4-6, *see also* 20:16). Rule 23 Plaintiffs Shane Casto, Jaret McCutcheon, Rachel Konkler, Susan Jahn, Myra King, and Jessica Fitzwater all agreed either that they were paid for all their canceled lunch deductions or that they have no claim for lost wages. (Casto Dep. 8:23; McCutcheon Dep. at 6:20-23; Konkler Dep. at 13:13-15, 14:10; Jahn Dep. at 20:1-4; King Dep. at 8:11-18; Fitzwater Dep. at 39:6-40:2). Thus, these Plaintiffs support *Marietta's* defense, rather than their own claims. Plaintiffs listed all seven of these deponents on the Witness List, meaning that any could be called to testify at trial despite the obvious contradictions that would be presented between their testimony and the Named Plaintiffs' testimony on critical issues in the case. Taken

together, this diverging, contradictory testimony suggests that the Named Plaintiffs' claims are not typical of the Rule 23 Plaintiffs, and thus the Court should decertify the Class.

Because the Named Plaintiffs' claims lack commonality with and are not typical of the Rule 23 Plaintiffs' claims, Plaintiffs cannot carry their burden of proof pursuant to Rule 23(a)(2) or (a)(3), and the Court should accordingly decertify the Rule 23 Class.

C. **Questions Of Law Or Fact Unique To The Individual Class Members Predominate Over Questions Common To The Class In Violation Of Rule 23(b)(3).**

Even if Plaintiffs could meet the requirements of Rule 23(a), their claims nonetheless fail as Plaintiffs cannot satisfy the requirements of Rule 23(b)(3). Rule 23(b)(3) permits class certification when "questions of law or fact common to class members predominate over any questions affecting only individual members," and when "a class action is superior to other methods available for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The predominance requirement demands a rigorous inquiry that "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623–24, 117 S.Ct. 2231 (1997). To meet this requirement, "a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Hendricks v. Total Quality Logistics, LLC*, No. 1:10-cv-649, 2019 WL 2387206, at *8 (S.D. Ohio Mar. 22, 2019) (quoting *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532, 544 (6th Cir. 2012)).

Plaintiffs' proposed trial witnesses gave widely diverging deposition testimony (as described *supra*), demonstrating that the case cannot be adjudicated as a class action. As the Court of Appeals for the Seventh Circuit has articulated, "The critical point [of a class action] is the need for *conduct* common to members of the class. . . . Where the defendant's alleged injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found." *Suchanek v. Sturm*

*Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (granting motion to decertify class) (emphasis in original) (internal quotation omitted); *see also Dukes*, 564 U.S. at 367 (the defendant has the "right to raise any individual affirmative defenses it may have," and is "entitle[d] to litigate its statutory defenses to individual claims.").

Just as in *Suchanek*, Plaintiffs here cannot point to "injurious . . . conduct common to members of the class." 764 F.3d at 756. In their depositions, Plaintiffs' Witnesses gave competing testimony on the key issues in the case, including (but not limited to): the substance of the meal break policy; whether the Witnesses were ever trained on the policy; whether the Witnesses ever actually cancelled a lunch deduction; what, if any, role the Witnesses' supervisors played in discouraging them from canceling the lunch deduction; and, whether the Witnesses even have a claim for lost wages.

This lack of common evidence will ultimately force the Court to conduct multiple mini-trials. Plaintiffs' unwillingness to produce a trial plan suggests that they, too, have no plan to ensure that a trial in this action will be manageable, further demonstrating that decertification in this case is warranted. *See, e.g. Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227, 1234 (9th Cir. 1996) (decertifying class because plaintiff made no showing "of how the class trial could be conducted"); *Espenscheid v. DirectSat USA, LLC*, 2011 WL 2009967, at *17 (W.D. WI, May 23, 2011) (decertifying class because plaintiffs failed to "propos[e] a trial plan that would lead to a fair result"), *aff'd,* 705 F. 3d 770 (7th Cir. 2013). These contradictions will be plainly established in Plaintiffs' *prima facie* case. Therefore, the issue presented does not relate to credibility, but rather to the lack of a unifying theme which could be decided on a class-wide basis. As Plaintiffs cannot carry their burden, the Court should decertify the Class.

## V.    CONCLUSION.

Plaintiffs cannot carry their burden to show their claims are capable of class-wide relief through either the FLSA collective action procedure or a Rule 23 class action. Though these issues were not apparent when the Court considered Plaintiffs' motion for conditional certification, discovery has revealed that Plaintiffs do not, as a group, raise the same claims – among these discrepancies, some plaintiffs claim to have been able to take lunch breaks consistently while others do not, some claim they had no knowledge of the option to cancel the lunch deduction while others do not, some claim their supervisors discouraged them from cancelling the lunch deduction while others do not, and so forth.  Plaintiffs raise many questions, but despite years of discovery, no representative evidence exists which can provide common answers to those questions. Therefore, the Court should, consistent with the majority of courts that have considered comparable class and collective action claims, decertify both the Collective and the Class.

Respectfully submitted,

/s/ *James E. Davidson*
James E. Davidson (0024534) (Trial Attorney)
Email: James.Davidson@icemiller.com
Catherine L. Strauss (0072980)
Email: Catherine.Strauss@icemiller.com
Abigail J. Barr (0092679)
Email: Abigail.Barr@icemiller.com
Lydia F. Reback (0097766)
Email: Lydia.Reback@icemiller.com
ICE MILLER LLP
250 West Street, Suite 700
Columbus, OH  43215
(614) 462-2700
Fax: (614) 462-5135

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 21st day of June 2021, the foregoing was filed using the Court's CM/ECF system, which will serve a copy of the same on all counsel of record.

/s/*James E. Davidson*
James E. Davidson (0024534) (Trial Attorney)